FEDERAL POWER COMMISSION ᴇᴛ ᴀʟ. *v.*
NATURAL GAS PIPELINE CO. ᴇᴛ ᴀʟ.*

No. 265.   Argued February 10, 11, 1942.—Decided March 16, 1942.

---

* Together with No. 268, *Natural Gas Pipeline Co. et al.* v. *Federal Power Commission et al.,* also on writ of certiorari, 314 U. S. 593, to the Circuit Court of Appeals for the Seventh Circuit.

*Messrs. George I. Haight* and *S. A. L. Morgan,* with whom *Messrs. J. J. Hedrick* and *William E. Lucas* were on the brief, for the Natural Gas Pipeline Co. et al.

*Mr. Richard H. Demuth* and *Solicitor General Fahy* for the Federal Power Commission, and *Mr. Albert E. Hallett,* Assistant Attorney General of Illinois, for the Illinois Commerce Commission. *Assistant Attorney General Shea* and *Messrs. Melvin H. Siegel, Harry R. Booth, Archibald Cox, Richard J. Connor, George Slaff,* and *George F. Barrett,* Attorney General of Illinois, were with them on the brief.

*Mr. John E. Benton* filed a brief on behalf of the National Association of Railroad and Utilities Commissioners, as *amicus curiae*, in support of the Federal Power Commission.

MR. CHIEF JUSTICE STONE delivered the opinion of the Court.

This is a rate case involving numerous questions which arise out of the Federal Power Commission's regulation, under §§ 5 (a) and 13 of the Natural Gas Act of 1938, 52 Stat. 821, 15 U. S. C. § 717, of the rates to be charged for the sale of natural gas by cross-petitioners, Natural Gas Pipeline Company of America and Texoma Natural Gas Company.

The two companies are engaged in business as a single enterprise. They produce natural gas from their own reserves in the Panhandle gas fields in Texas, and purchase gas produced there by others. They transport the gas by their own pipeline in interstate commerce to Illinois, where they sell the bulk of it at wholesale to utilities, which distribute and sell it for domestic, commercial and industrial uses.

The companies began operations in 1932 with a capital structure of $60,000,000 of six per cent bonds, later increased by $999,000, and $3,500,000 of common stock, of which $500,000 is stock of the Texoma Company, a non-profit corporation paying no dividends on its stock. During the first seven years of operation, beginning January 1, 1932, and extending through 1938, the companies charged against gross income various depreciation and depletion deductions aggregating $13,077,488,[1] and in addition

---

[1] These charges against income are slightly in excess of the accumulated reserves for depreciation and depletion—$12,557,892—shown by the books at the end of 1938. The excess of $519,596 is apparently due to the fact that during the period $7,000,918 of property, on

charged $6,481,322 for "retirements" of property. In that period they paid dividends amounting in all to $9,150,000. Although there were book deficits in earnings for the first two years, the total "net profit" available for dividends and surplus after payment of interest on the bonds was $8,224,436,[2] or an annual average of $1,174,919, which is 33.6% per annum on the $3,500,000 stock. The earnings available during the period for return on the capital investment of both stockholders and bondholders—after taking out of income $19,558,810 for depreciation, depletion and retirements—totalled $34,040,883; this makes an average of $4,862,983 annually, which is about 8% on the book figures for investment undepreciated, or 8.8% after deducting from investment the average depreciation and depletion reserves actually charged to earnings by the companies.[3] At the time of the hearing, over one-fourth of the bonds issued had been retired out of earnings.

On complaint of the Illinois Commerce Commission, and on its own motion, the Power Commission began separate investigations of the companies' rates. These proceedings were consolidated and after extensive hearings the Commission, for the purpose of issuing an interim order, accepted the companies' statement that the book cost of their property existing at the end of 1938 was $60,172,843, including working capital of $975,000.

---

the basis of book cost, was retired, while the annual retirement charges had aggregated only $6,481,322. The balance of the retirements, $519,596, apparently had been charged to the depreciation and depletion accounts.

[2] This includes a negligible item, "non-operating income," which for the seven-year period came to only $194,600.

[3] The book figures (which are on a cost basis) for invested capital average slightly under $61,000,000 if working capital is included. The depreciation and depletion reserves are taken from the accounts for which the aggregate figure, $12,557,892, is given in note 1, *supra*.

Likewise for the purpose of the order, it accepted the companies' estimate that the value of all physical property—calculated at reproduction cost new (except for gas reserves taken on the companies' statement to have a present value of $13,334,775)—was $74,420,424, which the Commission adopted as the rate base. It took the companies' own estimate of twenty-three years ending in 1954 as the life of the business, and for the amortization base used their cost figure of $78,284,009 for the total past and estimated future investment after deduction of estimated salvage. It calculated the "annual amortization expense" on that amount for the twenty-three year period, at a 6½% sinking fund interest rate, as $1,557,852, which it allowed.

The Commission also accepted, for the purpose of its interim order, the companies' estimate of prospective income available for amortization and return for the period 1939 to 1942 inclusive, as averaging $9,511,454 per annum. But making allowance for higher income tax rates under the Revenue Act of 1940, it found that the income available for amortization and return would be decreased to $9,362,032. It concluded that the companies' estimate of return, less the amortization allowance, ($9,362,032 less $1,557,852),—or $7,804,180—exceeded the fair return, $4,837,328 (which is 6½% of the rate base of $74,420,424), by $2,966,852, which amount was available for reduction of net revenues. Taking into account the decrease of $783,909 in federal income taxes which would result from such a decline in revenues, the Commission decided there was a total of $3,750,000 annually available for reduction of rates. It found the existing rates were "unjust, unreasonable and excessive," and made its interim order directing the companies to file a new schedule of rates and charges effective after September 1, 1940, which would bring about an annual reduction of $3,750,000 in operating revenues. The

order also provided that the record should "remain open" for such further proceedings as the Commission may deem necessary or desirable.

On the companies' petition for review of the order pursuant to § 19 (b) of the Act, the Court of Appeals for the Seventh Circuit, 120 F. 2d 625, upheld the validity of the rate regulation provisions of the Act, and the Commission's authority under the statute to issue the interim order directing reduction of the rates and requiring respondents to file new schedules reflecting that reduction. But the court vacated the Commission's order on the sole grounds that "going concern value" to the extent of $8,500,000 should have been included in the rate base, and that the amortization period for the entire property, instead of the full twenty-three year estimated life of the business taken by the Commission, should have been dated from the passage of the Act or the time of the Commission's order.

We granted certiorari, 314 U. S. 593, because of the novelty and importance of the questions presented upon the Commission's petition challenging the grounds of reversal below, and on the companies' cross petition assailing the constitutionality of the Act, the authority of the Commission to make the interim order, the prescribed 6½% return, the computation of the amortization allowance on the same rate of interest as the fair rate of return, and other features of the Commission's order presently to be discussed.

The Natural Gas Act declares that "the business of transporting and selling natural gas for ultimate distribution to the public is affected with a public interest," and that federal regulation of interstate commerce in natural gas "is necessary in the public interest." § 1 (a). The Act directs that all rates and charges in connection with the transportation or sale of natural gas, subject to the jurisdiction of the Commission, shall be "just and rea-

sonable" and declares to be unlawful any rate or charge which is not just and reasonable. § 4 (a). By § 5 the Commission, on its own motion or the complaint of a State, municipality, state commission or gas distributing company, is empowered to investigate the rates charged by any natural gas company in connection with any transportation or sale of any natural gas subject to the jurisdiction of the Commission, and after a hearing to determine just and reasonable rates.

*Constitutionality of the Act.* The argument that the provisions of the statute applied in this case are unconstitutional on their face is without merit. The sale of natural gas originating in one State and its transportation and delivery to distributors in any other State constitutes interstate commerce, which is subject to regulation by Congress. *Illinois Natural Gas Co.* v. *Central Illinois Public Service Co.*, 314 U. S. 498. It is no objection to the exercise of the power of Congress that it is attended by the same incidents which attend the exercise of the police power of a State. The authority of Congress to regulate the prices of commodities in interstate commerce is at least as great under the Fifth Amendment as is that of the States under the Fourteenth to regulate the prices of commodities in intrastate commerce. Compare *United States* v. *Carolene Products Co.*, 304 U. S. 144; *United States* v. *Rock Royal Co-op.*, 307 U. S. 533, 569; *Sunshine Coal Co.* v. *Adkins*, 310 U. S. 381, 393–97; *United States* v. *Darby*, 312 U. S. 100, with *Nebbia* v. *New York*, 291 U. S. 502; *Olsen* v. *Nebraska*, 313 U. S. 236.

The price of gas distributed through pipelines for public consumption has been too long and consistently recognized as a proper subject of regulation under the Fourteenth Amendment to admit of doubts concerning the propriety of like regulations under the Fifth. *Willcox* v. *Consolidated Gas Co.*, 212 U. S. 19; *Cedar Rapids*

*Gas Co.* v. *Cedar Rapids,* 223 U. S. 655; *Railroad Commission* v. *Pacific Gas Co.,* 302 U. S. 388. And the fact that the distribution here involved is by wholesale rather than retail sales presents no differences of significance to the protection of the public interest which is the object of price regulation. Cf. *Illinois Natural Gas Co.* v. *Central Illinois Public Service Co., supra.* The business of cross-petitioners is not any the less subject to regulation now because the Government has not seen fit to regulate it in the past. Cf. *Nebbia* v. *New York, supra,* 538–39.

*Validity of the Interim Order.* The companies contend that the Federal Power Commission has no authority under the Act to enter the type of order now under review, and that the order is invalid because the Commission did not itself fix reasonable rates as required by the Act but instead merely directed the companies to file a new rate schedule which would result in the prescribed reduction in operating revenues. Section 5 (a) of the Act provides: "Whenever the Commission, after a hearing . . ., shall find that any rate . . . is injust, unreasonable, unduly discriminatory, or preferential, the Commission shall determine the just and reasonable rate . . . . and shall fix the same by order." It also contains a proviso that the Commission shall not have power to order an increase of rates on file unless in accordance with a new schedule filed by the company. But without mention of new rate schedules the proviso adds that the Commission "may order a decrease where existing rates are unjust . . . or are not the lowest reasonable rates." And § 16 gives the Commission "power to . . . issue . . . such orders . . . as it may find necessary or appropriate to carry out the provisions of this Act."

The first prerequisite to an order by the Commission is that it shall be preceded by a hearing and findings. In this case, while the proceedings were not ended by the

interim order, the companies had full opportunity to offer all their evidence both direct and in rebuttal, and full opportunity to cross-examine every witness offered by both the Federal Power Commission and the Illinois Commerce Commission. All the evidence tendered was received and considered by the Commission, and before the interim order was entered counsel for the companies stated to the Commission that they had concluded the direct testimony in support of their case. So far as the order is supported by the evidence, the companies cannot complain that they were denied a full hearing because they had not been able to examine on redirect their own witnesses who had not been cross-examined or because they had no opportunity to cross-examine or rebut witnesses who were not offered by the Commission. The right to a full hearing before any tribunal does not include the right to challenge or rely on evidence not offered or considered. See *New England Divisions Case*, 261 U. S. 184, 201.

The establishment of a rate for a regulated industry often involves two steps of different character, one of which may appropriately precede the other. The first is the adjustment of the general revenue level to the demands of a fair return. The second is the adjustment of a rate schedule conforming to that level so as to eliminate discriminations and unfairness from its details. Such an orderly procedure for establishing the rates prescribed by the Act would seem to be an appropriate means of carrying out its provisions. Section 5 of the Act was modelled on the provisions of the Transportation Act, 49 U. S. C. §§ 13, 15, which have been interpreted as giving to the Interstate Commerce Commission authority to establish a general level of rates and divisions in advance of a schedule to be filed by the carriers. See *New England Divisions Case, supra,* 201–202, 203, n. 21. Cf. Sharfman, The Interstate Commerce

Commission, vol. 2, pp. 381–82; *Driscoll* v. *Edison Co.,* 307 U. S. 104.

We think that the proviso of § 5, already quoted, contemplates that, when existing rates are found to be unjust and unreasonable, an order decreasing revenues may be filed without establishing a specific schedule of rates. Since such an order may be in the interests of the public, as well as the regulated company, and is in harmony with the purposes of the Act, it is one which the Commission has discretion to make under § 16 as appropriate to carry out the provisions of the Act.

*The Scope of Judicial Review of Rates Prescribed by the Commission.* The ultimate question for our decision is whether the rate prescribed by the Commission is too low. The statute declares, § 4 (a), that the rates of natural gas companies subject to the Act "shall be just and reasonable, and any such rate or charge that is not just and reasonable is hereby declared to be unlawful." Section 5 (a) directs the Commission to "determine the just and reasonable rate" to be observed, and requires the Commission to "fix the same by order." It also provides that "the Commission may order a decrease where existing rates are unjust . . . unlawful, or are not the lowest reasonable rates." On review of the Commission's orders by a Circuit Court of Appeals as authorized by § 19 (b), the Commission's findings of fact "if supported by substantial evidence, shall be conclusive."

By long standing usage in the field of rate regulation, the "lowest reasonable rate" is one which is not confiscatory in the constitutional sense. *Los Angeles Gas Co.* v. *Railroad Commission,* 289 U. S. 287, 305; *Railroad Commission* v. *Pacific Gas Co., supra,* 394, 395; *Denver Stock Yard Co.* v. *United States,* 304 U. S. 470, 475. Assuming that there is a zone of reasonableness within which the Commission is free to fix a rate varying in amount and higher than a confiscatory rate, see *Banton* v. *Belt*

*Line Ry. Corp.*, 268 U. S. 413, 422, 423; *Columbus Gas Co.* v. *Commission*, 292 U. S. 398, 414; *Denver Stock Yard Co.* v. *United States, supra*, 483, the Commission is also free under § 5 (a) to decrease any rate which is not the "lowest reasonable rate." It follows that the Congressional standard prescribed by this statute coincides with that of the Constitution, and that the courts are without authority under the statute to set aside as too low any "reasonable rate" adopted by the Commission which is consistent with constitutional requirements.

The Constitution does not bind rate-making bodies to the service of any single formula or combination of formulas. Agencies to whom this legislative power has been delegated are free, within the ambit of their statutory authority, to make the pragmatic adjustments which may be called for by particular circumstances. Once a fair hearing has been given, proper findings made and other statutory requirements satisfied, the courts cannot intervene in the absence of a clear showing that the limits of due process have been overstepped. If the Commission's order, as applied to the facts before it and viewed in its entirety, produces no arbitrary result, our inquiry is at an end.

*Going Concern Value.* The companies insist that their business has a going concern value of $8,500,000, which the Commission did not include in the rate base and on which they are entitled to earn a return. In establishing the rate base for the purposes of the interim order the Commission "reluctantly" accepted the estimates of value, presented by the companies' own witnesses, as follows:

Reproduction Cost New of Physical Properties (exclusive of Gas Reserves) . . . . . . $56, 302, 250 [4]
Value of Gas Reserves as of June 1, 1939. . 13, 334, 775

---

[4] The estimates submitted by the companies stated that there should be deducted from this figure for "viewed depreciation" $2,866,758. However, in setting a rate base for the interim order, the Commission

Capital Additions from June 1, 1939, to December 31, 1942...................... $3, 808, 399 [5]
Working Capital ...................... 975, 000

Total Rate Base................. $74, 420, 424

While no item for going concern value is separately stated in the rate base, the computation of cost new of physical equipment included—in addition to labor and cost of materials—large amounts for overhead, interest, taxes, administration, legal and supervisory charges, and expenses paid or incurred in assembling the plant as that of a going concern.

The Commission spoke of the rate base thus arrived at as "liberal" and as a "generous allowance." That the estimate of reproduction costs new is liberal is indicated by the circumstances that the companies' structures other than gas reserves were built in 1930–1931 at a time, as the record shows, of relatively high prices, and that their reproduction cost depreciated is greater than actual cost, which was about $50,000,000. And the allowed "present value" of leases as of June 1, 1939, $13,334,775, is approximately $4,000,000 more than book cost, even without taking into account a substantial reduction for depletion reserves of $1,152,854, which the companies had accrued on

did not make this conceded deduction—perhaps because it held, contrary to the companies' contention, that the properties should be amortized over the entire life of the business.

[5] The companies estimated that the cost of additional property, not including replacements, during the future life of the enterprise, subsequent to June 1, 1939, would be $9,145,083. On this basis, they claimed that there should be included in the rate base $6,046,286, which they said would be the estimated average investment. The Commission included in the rate base only $3,808,399, which was the companies' estimated outlay for capital additions through the end of 1942. This reduction does not appear to be challenged. In any event, the refusal to include in the rate base capital expenditures not yet made can not involve confiscation.

their own books by the end of 1938. The Commission declined to include going concern value as an additional item in the rate base.

The companies urge, as the Court of Appeals held, that there are items of cost or expense incurred in the establishment and development of the business during the seven-year period prior to regulation, which were not included in the companies' estimate of value accepted by the Commission, and which, in view of the special characteristics of the business, should be capitalized and added to the rate base to the extent of $8,500,000 for going concern value. They include, in amounts not now material, the following: expenditures for securing new business; interest on money invested in non-productive plant capacity; taxes paid on non-productive capacity; fixed operating expenses attributable to non-productive capacity, and depreciation on non-productive capacity.[6] The companies' contentions with respect to all these items are predicated upon the limited life of the business, twenty-three years, and on testimony that in anticipation of its growth larger gas mains and facilities were constructed than were required during the earlier years of the business. The reproduction cost new of this excess of equipment is admittedly included in the rate base.

None of these items appears in the companies' capital account. With the possible exception of expenditures for securing new business, they are synthetic figures arrived at by estimating the amount of expense attributable to the current cost of maintenance of the excess capacity of the plant during periods when the excess capacity was not

[6] The item for depreciation on non-productive capacity, amounting to $382,833, is obviously provided for in the Commission's allowance for depreciation. The value of the companies' entire plant, whether fully productive or not, is included in the rate base and, as will presently appear, provision was made by the Commission's order for its amortization on a cost basis from earnings.

used. But the interest charges, taxes and other costs of maintaining this excess capacity during the period when not in use have not been capitalized by the companies on their books and so far as appears were paid from current earnings. The same is true of the expenditure for advertising and other expenses of acquiring new business. .

The novel question is thus presented whether confiscation, proscribed by Congress as well as the Constitution, results from the exclusion from the rate base of the previous costs of maintaining excess plant capacity and of getting new business. The Commission gave full consideration to this contention. It said: "The companies' claim for $8,500,000 for going concern value must be disallowed. The amount obviously is an arbitrary claim, not supported by substantial evidence warranting its allowance. Its allowance would mean the acceptance of a deceptive fiction, resulting in an unfair imposition upon consumers. We are convinced that we are allowing in our rate base more than an adequate amount to cover all elements of value."

There is no constitutional requirement that going concern value, even when it is an appropriate element to be included in a rate base, must be separately stated and appraised as such. This Court has often sustained valuations for rate purposes of a business assembled as a whole, without separate appraisal of the going concern element. *Columbus Gas Co.* v. *Commission,* 292 U. S. 398, 411; *Dayton P. & L. Co.* v. *Commission,* 292 U. S. 290, 309; *Denver Stock Yard Co.* v. *United States, supra,* 478–480; *Driscoll* v. *Edison Co., supra,* 117. When that has been done, the burden rests on the regulated company to show that this item has neither been adequately covered in the rate base nor recouped from prior earnings of the business. *Des Moines Gas Co.* v. *Des Moines,* 238 U. S. 153, 166.

The total value of the companies' plant, including equipment in excess of immediate needs when beginning business, has been included in the rate base adopted. If rightly included, as the Commission has assumed for purposes of the order, the companies would have been entitled to earn a fair return upon its value, had the business been regulated from the start. But it does not follow that the companies' property would be confiscated by denying to them the privilege of capitalizing the maintenance cost of excess plant capacity, which would allow them to earn a return and amortization allowance upon such costs during the entire life of the business. It is only on the assumption that excess capacity is a part of the utility's equipment used and useful in the regulated business, that it can be included as a part of the rate base on which a return may be earned. When so included, the utility gets its return not from capitalizing the maintenance cost, but from current earnings by rates sufficient, having in view the character of the business, to secure a fair return upon the rate base, provided the business is capable of earning it. But regulation does not insure that the business shall produce net revenues, nor does the Constitution require that the losses of the business in one year shall be restored from future earnings by the device of capitalizing the losses and adding them to the rate base on which a fair return and depreciation allowance is to be earned. *Galveston Electric Co.* v. *Galveston,* 258 U. S. 388; *San Diego Land & Town Co.* v. *Jasper,* 189 U. S. 439, 446–47. The deficiency may not be thus added to the rate base, for the obvious reason that the hazard that the property will not earn a profit remains on the company in the case of a regulated, as well as an unregulated, business.

Here the companies, though unregulated, always treated their entire original investment, together with subsequent additions, as capital on which profit was to be earned.

They charged the out-of-pocket cost of maintenance of plant, whether used to capacity or not, as operating expenses deductible from earnings before arriving at net profits. They have thus treated the items now sought to be capitalized in the rate base as operating expenses to be compensated from earnings, as in the case of regulated companies. The history of the first seven years of operation before regulation shows an average annual return,[7] after deduction of operating expenses, of approximately 8% on the undepreciated investment. This high return was earned during a period which included the severest depression in our history.

Whether there is going concern value in any case depends upon the financial history of the business. *Houston* v. *Southwestern Tel. Co.*, 259 U. S. 318, 325. This is peculiarly true of a business which derives its estimates of going concern value from a financial history preceding regulation. That history here discloses no basis for going concern value, both because the elements relied upon for that purpose could rightly be rejected as capital investment in the case of a regulated company, and because in the present case it does not appear that the items, which have never been treated as capital investment, have not been recouped during the unregulated period.

We cannot say that the Commission has deprived the companies of their property by refusing to permit them to earn for the future a fair return and amortization on the costs of maintenance of initial excess capacity—costs which the companies fail to show have not already been recouped from earnings before computing the substantial "net profits" earned during the first seven years. The items for advertising and acquiring new business have been treated in the same way by the companies, and do

---

[7] Besides $8,244,435 of "net profits," the companies paid out of gross income $23,994,030 as interest on the bonds.

not, in the circumstances of this case, stand on any different footing. Cf. *West Ohio Gas Co.* v. *Commission,* 294 U. S. 63, 72.

*The Amortization Base.* The Commission took as the amortization base the sum of $78,284,009. This was made up of the companies' total investment, at the end of 1938, of $67,173,761 (without deduction of property retirements already made), plus estimated future capital additions through 1954, including replacements, amounting to $12,159,380,[8] less estimated salvage at the predicted end of the project in 1954. It is not questioned that the Commission's annual amortization allowance of $1,557,852, accumulated at the sinking fund interest rate of $6\frac{1}{2}\%$ adopted by the order, will be sufficient in 1954 to restore the capital investment so computed.

The companies argue that the amortization base, computed on a basis of reproduction cost, should be $84,341,218[9] rather than cost plus estimated future capital additions. But the purpose of the amortization allowance and its justification is that it is a means of restoring from current earnings the amount of service capacity of the business consumed in each year. *Lindheimer* v. *Illinois*

---

[8] We do not intimate any approval of the inclusion in the amortization base of all the estimated future capital additions.

[9] The companies' proposed amortization base was made up of the following items:

| | |
|---|---:|
| Reproduction cost new, excluding gas reserves.. | $56,302,250 |
| Viewed depreciation (deduct)............... | 2,866,758 |
| Value of gas reserves....................... | 13,334,775 |
| Cost of additional property................. | 9,145,083 |
| Going concern value....................... | 8,500,000 |
| Working capital........................... | 975,000 |
| | $85,390,350 |
| Less salvage........................ | 1,049,132 |
| | $84,341,218 |

*Tel. Co.,* 292 U. S. 151, 167.   When the property is devoted to a business which can exist for only a limited term, any scheme of amortization which will restore the capital investment at the end of the term involves no deprivation of property.   Even though the reproduction cost of the property during the period may be more than its actual cost, this theoretical accretion to value represents no profit to the owner, since the property dedicated to the business, save for its salvage value, is destined for the scrap-heap when the business ends.   The Constitution does not require that the owner who embarks in a wasting-asset business of limited life shall receive at the end more than he has put into it.   We need not now consider whether, as the Government urges, there can in no circumstances be a constitutional requirement that the amortization base be the reproduction value rather than the actual cost of the property devoted to a regulated business.   Cf. *United Railways Co.* v. *West,* 280 U. S. 234, 265.   It is enough that here the business, by hypothesis, will end in 1954, and that the amortization base, computed at cost and including property already retired, will be completely restored by 1954 by the annual amortization allowances. As the Commission declared: "The amounts of amortization are recognized and treated as operating expenses. Operating expenses are stated on the basis of cost. . . . We refuse to make an allowance of amortization in excess of cost.   To do so would not be the computation of a proper expense, but instead the allowance of additional profit over and above a fair return.   Manifestly such an additional return would unjustly penalize consumers."

*The Amortization Period.*   The court below held that, since the business was unregulated for the first seven years, the adoption by the Commission of the estimated twenty-three year life of the business as the amortization period involved a denial of due process.   In view of the estimate by the Commission and the companies that the

gas properties would be exhausted in about sixteen years from the date of the Act, the court thought, as the companies argue, that a rate of return would be confiscatory which would not provide, in addition to a fair return, an annual amortization allowance sufficient to restore the total investment over the final sixteen-year period. But this argument overlooks the fact that the depreciation of physical property attributed to use, and the obsolescence of the entire property attributable to lapse of time in the case of a business having a limited life, had been taking place during the seven years before regulation and that those items must be recouped if at all from earnings. Capital investment loss at the end of the life of a business can only be avoided by restoration of the investment from earnings, and is avoidable so far as is humanly possible only by an appropriate charge of amortization to earnings as they accrue.

Here, there is no question but that the Commission's annual amortization allowance, if applied over the entire twenty-three year life of the business, is sufficient to restore the total capital investment at the end, or that earnings of the past and those estimated for the future together are sufficient to provide for the amortization allowance and a fair return, given an appropriate rate base and rate of return. Making that assumption, we cannot say that adequate provision has not been made for restoration of the companies' investment from earnings, and a fair return on the investment. Even though the companies were unregulated for seven years, earnings during that period were available and adequate for amortization. In fact, the companies' charges to earnings, for depreciation, depletion and retirements, totalled $19,558,810, or an average of $2,794,115 per annum. This was in conformity with the established business practice, in the case of unregulated as well as regulated businesses, to make such a depreciation or amortization

allowance chargeable annually to earnings as an operating expense in order to provide adequately for annual consumption of capital in the business. *Lindheimer* v. *Illinois Tel. Co.*, *supra.*

The companies are not deprived of property by a requirement that they credit in the amortization account so much of the earnings received during the prior period as are appropriately allocable to it for amortization. Only by that method is it possible to determine the amount of earnings which may justly be required for amortization during the remaining life of the business.

*Amortization Interest Rate.* The annual amortization allowances of $1,557,852, if accumulated at a 6½% compound interest rate until the assumed exhaustion of the gas reserves in 1954, will be sufficient to restore the undepreciated total investment less the salvage value of the property. The companies urge that the interest rate should have been lower, say 2%, on the assumption that only some such lower rate would be earned by a hypothetical sinking fund to be created from the annual amortization allowances. But the argument ignores the fact that the amortization method adopted by the Commisssion contemplates not a sinking fund of segregated securities purchased with cash withdrawn from the business, but merely a sinking fund reserve charged to earnings and not distributable as ordinary dividends. Under this method there is no deduction of the amortization allowances from the rate base on which a fair return— 6½% under the current interim order—is to be allowed during the life of the business.

The companies are thus allowed to earn in each year, in addition to the amortization allowance, 6½% on both the amortized and the unamortized portions of the base. If the amortization interest were computed at a 2% rate without deducting the amortized portion from the rate base, the companies would continue to receive a 6½%

instead of only a 2% return on that portion of the investment. True, the method of amortization adopted means that the companies look to the earnings of the business for the hypothetical interest on amortization reserve. This, it is argued, may involve more business risk than a method of amortization contemplating the actual withdrawal from the business of the amortization allowances and their investment in segregated securities bearing a lower rate of interest. But here the 6½% rate of return allowed on the amortized portion of the rate base includes compensation for the business risk, and the risk is an incident of the business in which the companies have hazarded their capital and in which they propose to invest additional capital. The Commission declared it adopted this method to avoid the inequitable result which would follow if the companies were permitted to include in their charges to the public 6½% on the amortized portion of the base, while treating it as earning only 2%. The Commission's conclusion that this is an appropriate method is supported by the evidence, and in any case it does not appear that it has deprived or will deprive the companies of property.

*Fair Rate of Return.* The Commission found that "6½ per cent is a fair annual rate of return upon the rate base allowed," which it had characterized as "a generous allowance." The courts are required to accept the Commission's findings if they are supported by substantial evidence. § 19(b). We cannot say, on this record, that the Commission was bound to allow a higher rate.

The evidence shows that profits earned by individual industrial corporations declined from 11.3% on invested capital in 1929 to 5.1% in 1938. The profits of utility corporations declined during the same period from 7.2% to 5.1%. For railroad corporations, the decline was from 6.4% to 2.3%. Interest rates were at a low level on all forms of investment, and among the lowest that have

ever existed. The securities of natural gas companies were sold at rates of return of from 3% to 6%, with yields on most of their bond issues between 3% and 4%. The interest on large loans ranged from 2% to 3.25%.

The regulated business here seems exceptionally free from hazards which might otherwise call for special consideration in determining the fair rate of return. Substantially all its product is distributed in the metropolitan area of Chicago, a stable and growing market, through distributing companies which own 26% of the investment of the Natural Gas Pipeline Company. Ninety per cent of its gas is taken under contract by the Chicago District Pipeline Company. The contract runs until 1946 or until 1951, at the option of the companies. Under it the District Company is bound to take, or at least pay for, 66⅔% of the companies' gas, and performance is guaranteed by the three companies distributing the gas in Chicago.

The danger of early exhaustion of the gas field was fully taken into account in the estimate of its life, and the companies' estimate was accepted. Provision for the complete amortization of the investment within that period affords a security to the investment which is lacking to those industries whose capital investments must be continued for an indefinite period. The companies' affiliation with the six large corporations which directly or indirectly own all the stock, places them in a strong position for their future financing. The business is in the same position as other similar businesses with respect to increased taxation, inflation and costs of operation. Other factors, such as credit risks, risks of technological changes, varying demands for product, relatively small labor requirements, and conversion of inventory into cash, compare more favorably. After a full consideration of all of these factors and of expert testimony, the Commission concluded that the prescribed reduction in

revenues was just and reasonable, and that the 6½% was a fair rate of return.

*Disposition of Excess Charges Collected Since the Commission's Order.* The Circuit Court of Appeals stayed the Commission's order pending appeal. The companies state that, as a condition of the stay, the court required them to give a bond in the sum of $1,000,000, conditioned upon their refund of excess charges to customers, in the event that the Commission's order should be sustained. The bond is not in the record and its precise terms are not before us.

The companies point out that substantially all the gas affected by the reduction in revenues is sold to wholesalers who distribute it for ultimate consumption. They argue that the purpose of the rate regulation is the protection of consumers, and that the purposes of the Act will not be effectuated by the refunds to wholesalers. They insist that such refunds, being the wholesalers' profits from past business, cannot be resorted to for reducing future rates to the consumers. Cf. *Knoxville* v. *Knoxville Water Co.,* 212 U. S. 1, 14; *Galveston Electric Co.* v. *Galveston, supra,* 258 U. S. at 395.

Of this contention it is enough to say that the question of the disposition of the excess charges is not before us for determination on the present record. Cf. *Morgan* v. *United States,* 304 U. S. 1, 26. Amounts collected in excess of the Commission's order are declared to be unlawful by § 4 (a) of the Act. If there is any basis, either in the bond or the circumstances relied upon by the companies, for not compelling the companies to surrender these illegal exactions, it does not appear from the record.

We have considered but find it unnecessary to discuss other objections of lesser moment to the Commission's order. We sustain the validity of the order and reverse the judgment below.

*Reversed.*

Mr. Justice Black, Mr. Justice Douglas, and Mr. Justice Murphy, concurring.

## I

We concur with the Court's judgment that the rate order of the Federal Power Commission, issued after a fair hearing upon findings of fact supported by substantial evidence, should have been sustained by the court below. But insofar as the Court assumes that, regardless of the terms of the statute, the due process clause of the Fifth Amendment grants it power to invalidate an order as unconstitutional because it finds the charges to be unreasonable, we are unable to join in the opinion just announced.

Rate making is a species of price fixing. In a recent series of cases, this Court has held that legislative price fixing is not prohibited by the due process clause.[1] We believe that, in so holding, it has returned, in part at least, to the constitutional principles which prevailed for the first hundred years of our history. *Munn* v. *Illinois,* 94 U. S. 113; *Peik* v. *Chicago & N. W. Ry. Co.,* 94 U. S. 164. Cf. *McCart* v. *Indianapolis Water Co.,* 302 U. S. 419, 427–

---

[1] Some of these cases arose under the Fifth, some under the Fourteenth, Amendment. *Nebbia* v. *New York,* 291 U. S. 502 (state statute authorizing a milk control board to fix minimum and maximum retail prices for milk); *Mulford* v. *Smith,* 307 U. S. 38 (federal statute imposing penalties on tobacco auction warehousemen for .marketing tobacco in excess of prescribed quota); *United States* v. *Rock Royal Co-op.,* 307 U. S. 533 (federal statute authorizing Secretary of Agriculture to fix minimum prices to be paid producers for milk sold to dealers); *Sunshine Coal Co.* v. *Adkins,* 310 U. S. 381 (federal statute authorizing Bituminous Coal Commission to fix maximum and minimum prices for bituminous coal); *United States* v. *Darby,* 312 U. S. 100 (federal statute fixing minimum wages (and maximum hours) for employees engaged in production of goods for interstate commerce); *Olsen* v. *Nebraska,* 313 U. S. 236 (state statute fixing maximum compensation to be collected by private employment agencies).

428.   The *Munn* and *Peik* cases, decided in 1877, Justices Field and Strong dissenting, emphatically declared price fixing to be a constitutional prerogative of the legislative branch, not subject to judicial review or revision.

In 1886, four of the Justices who had voted with him in the *Munn* and *Peik* cases no longer being on the Court, Chief Justice Waite expressed views in an opinion of the Court which indicated a yielding in part to the doctrines previously set forth in Mr. Justice Field's dissenting opinions, although the decision, upholding a state regulatory statute, did not require him to reach this issue.   See *Railroad Commission Cases*, 116 U. S. 307, 331.   For an interesting discussion of the evolution of this change of position, see Swisher, Stephen J. Field, 372–392.   By 1890, six Justices of the 1877 Court, including Chief Justice Waite, had been replaced by others.   The new Court then clearly repudiated the opinion expressed for the Court by Chief Justice Waite in the *Munn* and *Peik* cases, in a holding which accorded with the views of Mr. Justice Field.   *Chicago, M. & St. P. Ry. Co.* v. *Minnesota*, 134 U. S. 418.   Under those views, first embodied in a holding of this Court in 1890, "due process" means no less than "reasonableness judicially determined." [2]   In accordance with this elastic meaning which, in the words of Mr. Justice Holmes, makes the sky the limit [3] of judicial power to declare legislative acts unconstitutional,   the conclusions of judges, substituted for those of legislatures, become a broad and varying standard of constitutionality.[4]   We

---

[2] See *Polk Company* v. *Glover*, 305 U. S. 5, 12–19.   Cf. *Chambers* v. *Florida*, 309 U. S. 227, 235–238.

[3] "As the decisions now stand, I see hardly any limit but the sky to the invalidating of those rights if they happen to strike a majority of this Court as for any reason undesirable." *Baldwin* v. *Missouri* 281 U. S. 586, 595.

[4] To hold that the Fourteenth Amendment was intended to and did provide protection from state invasions of the right of free speech

shall not attempt now to set out at length the reasons for our belief that acceptance of such a meaning is historically unjustified and that it transfers to courts powers which, under the Constitution, belong to the legislative branch of government. But we feel that we must record our disagreement from an opinion which, although upholding the action of the Commission on these particular facts, nevertheless gives renewed vitality to a "constitutional" doctrine which we are convinced has no support in the Constitution.

The doctrine which makes of "due process" an unlimited grant to courts to approve or reject policies selected by legislatures in accordance with the judges' notion of reasonableness had its origin in connection with legislative attempts to fix the prices charged by public utilities. And in no field has it had more paralyzing effects.[5]

## II

We have here, to be sure, a statute which expressly provides for judicial review. Congress has provided in § 5 of the Natural Gas Act that the rates fixed by the Commission shall be "just and reasonable." The provision for judicial review states that the "finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive." § 19 (b). But we are not satisfied that the opinion of the Court properly delimits the scope of that review under this Act. Furthermore, since this case starts

and other clearly defined protections contained in the Bill of Rights, *Drivers Union* v. *Meadowmoor Co.*, 312 U. S. 287, 301–302, is quite different from holding that "due process," an historical expression relating to procedure, *Chambers* v. *Florida, supra,* confers a broad judicial power to invalidate all legislation which seems "unreasonable" to courts. In the one instance, courts proceeding within clearly marked constitutional boundaries seek to execute policies written into the Constitution; in the other, they roam at will in the limitless area of their own beliefs as to reasonableness and actually select policies, a responsibility which the Constitution entrusts to the legislative representatives of the people.

[5] *McCart* v. *Indianapolis Water Co., supra.*

a new chapter in the regulation of utility rates, we think it important to indicate more explicitly than has been done the freedom which the Commission has both under the Constitution and under this new statute. While the opinion of the Court erases much which has been written in rate cases during the last half century, we think this is an appropriate occasion to lay the ghost of *Smyth* v. *Ames,* 169 U. S. 466, which has haunted utility regulation since 1898. That is especially desirable lest the reference by the majority to "constitutional requirements" and to "the limits of due process" be deemed to perpetuate the fallacious "fair value" theory of rate making in the limited judicial review provided by the Act.

*Smyth* v. *Ames* held (pp. 546-547) that "the basis of all calculations as to the reasonableness of rates to be charged by a corporation maintaining a highway under legislative sanction must be the fair value of the property being used by it for the convenience of the public. And in order to ascertain that value, the original cost of construction, the amount expended in permanent improvements, the amount and market value of its bonds and stock, the present as compared with the original cost of construction, the probable earning capacity of the property under particular rates prescribed by statute, and the sum required to meet operating expenses, are all matters for consideration, and are to be given such weight as may be just and right in each case. We do not say that there may not be other matters to be regarded in estimating the value of the property. What the company is entitled to ask is a fair return upon the value of that which it employs for the public convenience. On the other hand, what the public is entitled to demand is that no more be exacted from it for the use of a public highway than the services rendered by it are reasonably worth."

(1) This theory derives from principles of eminent domain. See Mr. Justice Brewer, *Ames* v. *Union Pacific Ry.*

*Co.*, 64 F. 165, 177; *West* v. *Chesapeake & Potomac Telephone Co.*, 295 U. S. 662, 671; Hale, Conflicting Judicial Criteria of Utility Rates, 38 Col. L. Rev. 959. In condemnation cases the "value of property, generally speaking, is determined by its productiveness—the profits which its use brings to the owner." *Monongahela Navigation Co.* v. *United States*, 148 U. S. 312, 328, 329. Cf. *Consolidated Rock Products Co.* v. *Du Bois*, 312 U. S. 510, 525–526. But those principles have no place in rate regulation. In the first place, the value of a going concern in fact depends on earnings under whatever rates may be anticipated. The present fair value rule creates, but offers no solution to, the dilemma that value depends upon the rates fixed and the rates upon value. See Mr. Justice Brandeis, *Southwestern Bell Telephone Co.* v. *Public Service Commission*, 262 U. S. 276, 292; Hale, The Fair Value Merry-Go-Round, 33 Ill. L. Rev. 517; 2 Bonbright, Valuation of Property, pp. 1094 *et seq.* In the second place, when property is taken under the power of eminent domain the owner is "entitled to the full money equivalent of the property taken, and thereby to be put in as good position pecuniarily as it would have occupied if its property had not been taken." *United States* v. *New River Collieries Co.*, 262 U. S. 341, 343. But in rate-making, the owner does not have any such protection. We know, without attempting any valuation, that if earnings are reduced the value will be less. But that does not stay the hand of the legislature or its administrative agency in making rate reductions. As we have said, rate-making is one species of price-fixing. Price-fixing, like other forms of social legislation, may well diminish the value of the property which is regulated. But that is no obstacle to its validity. As stated by Mr. Justice Holmes in *Block* v. *Hirsh*, 256 U. S. 135, 155: "The fact that tangible property is also visible tends to give a rigidity to our conception of our rights in it that we do not attach to others less con-

cretely clothed. But the notion that the former are exempt from the legislative modification required from time to time in civilized life is contradicted not only by the doctrine of eminent domain, under which what is taken is paid for, but by that of the police power in its proper sense, under which property rights may be cut down, and to that extent taken, without pay." Somewhat the same view was expressed in *Nebbia* v. *New York,* 291 U. S. 502, 532, where this Court said: "The due process clause makes no mention of sales or of prices any more than it speaks of business or contracts or buildings or other incidents of property. The thought seems nevertheless to have persisted that there is something peculiarly sacrosanct about the price one may charge for what he makes or sells, and that, however able to regulate other elements of manufacture or trade, with incidental effect upon price, the state is incapable of directly controlling the price itself. This view was negatived many years ago. *Munn* v. *Illinois,* 94 U. S. 113." Explicit recognition of these principles will place the problems of rate-making in their proper setting under this statute.

(2) The rule of *Smyth* v. *Ames,* as construed and applied, directs the rate-making body in forming its judgment as to "fair value" to take into consideration various elements—capitalization, book cost, actual cost, prudent investment, reproduction cost. See Mr. Justice Brandeis, *Southwestern Bell Telephone Co.* v. *Public Service Commission, supra,* pp. 294–295. But as stated by Mr. Justice Brandeis: "Obviously 'value' cannot be a composite of all these elements. Nor can it be arrived at on all these bases. They are very different; and must, when applied in a particular case, lead to widely different results. The rule of *Smyth* v. *Ames,* as interpreted and applied, means merely that all must be considered. What, if any, weight shall be given to any one, must practically rest in the judicial discretion of the tribunal which makes the deter-

mination.   Whether a desired result is reached may depend upon how any one of many elements is treated." *Id.,* pp. 295–296.   The risks of not giving weight to reproduction cost have been great.   *Southwestern Bell Telephone Co.* v. *Public Service Commission, supra; St. Louis & O'Fallon Ry. Co.* v. *United States,* 279 U. S. 461. The havoc raised by insistence on reproduction cost is now a matter of historical record.   Mr. Justice Brandeis in the *Southwestern Bell Telephone* case demonstrated how the rule of *Smyth* v. *Ames* has seriously impaired the power of rate-regulation and how the "fair value" rule has proved to be unworkable by reason of the time required to make the valuations, the heavy expense involved, and the unreliability of the results obtained.[6]   And see Mr. Justice Brandeis concurring, *St. Joseph Stock Yards Co.* v. *United States,* 298 U. S. 38, 73; dissenting opinion, *Mc-Cart* v. *Indianapolis Water Co.,* 302 U. S. 419, 423 *et seq.;* Mr. Justice Stone dissenting, *West* v. *Chesapeake & Potomac Telephone Co., supra.*   The result of this Court's rulings in rate cases since *Smyth* v. *Ames* has recently been summarized as follows: "Under the influence of these precedents, commission regulation has become so cumbersome and so ineffective that it may be said, with only slight exaggeration, to have broken down.   Even the investor,[7] on whose behalf the constitutional safeguards have

---

[6] "The relation between the public utility and the community cannot be expressed in terms of a simple, quantitatively ascertainable fact, for the relation involves numerous and complex factors which depend on compromise and practical adjustment rather than on deductive logic. The whole doctrine of *Smyth* v. *Ames* rests upon a gigantic illusion. The fact which for twenty years the court has been vainly trying to find does not exist. 'Fair value' must be shelved among the great juristic myths of history, with the Law of Nature and the Social Contract.   As a practical concept, from which practical conclusions can be drawn, it is valueless." Henderson, Railway Valuation and the Courts, 33 Harv. L. Rev. 1031, 1051.

[7] "Such valuation proceedings, as heretofore conducted, are excessively costly, require a long period of time, affect adversely the

been developed, has received no protection against the rebounds from the inflated stock-market prices that are stimulated by the 'fair-value' doctrine." Bonbright, *op. cit.*, p. 1154.

As we read the opinion of the Court, the Commission is now freed from the compulsion of admitting evidence on reproduction cost or of giving any weight to that element of "fair value." The Commission may now adopt, if it chooses, prudent investment as a rate base— the base long advocated by Mr. Justice Brandeis. And for the reasons stated by Mr. Justice Brandeis in the *Southwestern Bell Telephone* case, there could be no constitutional objection if the Commission adhered to that formula and rejected all others.

Yet it is important to note, as we have indicated, that Congress has merely provided in § 5 of the Natural Gas Act that the rates fixed by the Commission shall be "just and reasonable." It has provided no standard beyond that. Congress, to be sure, has provided for judicial review. But § 19(b) states that the "finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive." In view of these provisions, we do not think it is permissible for the courts to concern themselves with any issues as to the economic merits of a rate base. The Commission has a broad area of discretion for selection of an appropriate rate base. The requirements of "just and reasonable" embrace, among other factors, two phases of the public interest: (1) the

corporation's credit, interfere with its financing upon favorable terms, and frequently cause the postponement of extensions and improvements to the great detriment of the public. Unless and until there is some change in the legal principles which must be applied in determining fair value, however, the industry cannot escape from this situation." Report of the Committee on Valuation, American Electric Railway Assoc., 1924, p. 20.

investor interest; (2) the consumer interest. The investor interest is adequately served if the utility is allowed the opportunity to earn the cost of the service. That cost has been defined by Mr. Justice Brandeis as follows: "Cost includes not only operating expenses, but also capital charges. Capital charges cover the allowance, by way of interest, for the use of the capital, whatever the nature of the security issued therefor; the allowance for risk incurred; and enough more to attract capital." *Southwestern Bell Telephone Co.* v. *Public Service Commission, supra,* 262 U. S. at p. 291. Irrespective of what the return may be on "fair value," if the rate permits the company to operate successfully and to attract capital all questions as to "just and reasonable" are at an end so far as the investor interest is concerned. Various routes to that end may be worked out by the expert administrators charged with the duty of regulation. It is not the function of the courts to prescribe what formula should be used. The fact that one may be fair to investors does not mean that another would be unfair. The decision in each case must turn on considerations of justness and fairness which cannot be cast into a legalistic formula. The rate of return to be allowed in any given case calls for a highly expert judgment. That judgment has been entrusted to the Commission. There it should rest.

One *caveat,* however, should be entered. The consumer interest cannot be disregarded in determining what is a "just and reasonable" rate. Conceivably, a return to the company of the cost of the service might not be "just and reasonable" to the public. The correct principle was announced by this Court in *Covington & Lexington Turnpike Co.* v. *Sandford,* 164 U. S. 578, 596: "It cannot be said that a corporation is entitled, as of right, and without reference to the interests of the pub-

lic, to realize a given per cent upon its capital stock. When the question arises whether the legislature has exceeded its constitutional power in prescribing rates to be charged by a corporation controlling a public highway, stockholders are not the only persons whose rights or interests are to be considered. The rights of the public are not to be ignored. It is alleged here that the rates prescribed are unreasonable and unjust to the company and its stockholders. But that involves an inquiry as to what is reasonable and just for the public. If the establishing of new lines of transportation should cause a diminution in the number of those who need to use a turnpike road, and, consequently, a diminution in the tolls collected, that is not, in itself, a sufficient reason why the corporation, operating the road, should be allowed to maintain rates that would be unjust to those who must or do use its property. The public cannot properly be subjected to unreasonable rates in order simply that stockholders may earn dividends." Cf. *Chicago & Grand Trunk Ry. Co.* v. *Wellman,* 143 U. S. 339, 345–346; *United Gas Co.* v. *Texas,* 303 U. S. 123, 150–151.

This problem carries into a field not necessary to develop here. It reëmphasizes, however, that the investor interest is not the sole interest for protection. The investor and consumer interests may so collide as to warrant the rate-making body in concluding that a return on historical cost or prudent investment, though fair to investors, would be grossly unfair to the consumers. The possibility of that collision reinforces the view that the problem of rate-making is for the administrative experts, not the courts, and that the *ex post facto* function previously performed by the courts should be reduced to the barest minimum which is consistent with the statutory mandate for judicial review. That review should be as confined and restricted as the review, under similar statutes, of orders of other administrative agencies.

MR. JUSTICE FRANKFURTER, concurring:

I wholly agree with the opinion of the CHIEF JUSTICE.

Congress has in the Natural Gas Act specifically cast upon courts the duty to review orders of the Federal Power Commission fixing "just and reasonable" rates. The constitutional scope of judicial review of rate orders where Congress has denied judicial review is therefore not in issue in this case. Discussion of the problem is academic, especially since we all concur in the CHIEF JUSTICE's conclusions on the rate order here made by the Commission. But since the issue has been stirred, I add a few words because legal history still has its claims.

While the doctrine of "confiscation," as a limitation to be enforced by the judiciary upon the legislative power to fix utility rates, was first applied in *Chicago, M. & St. P. Ry. Co.* v. *Minnesota,* 134 U. S. 418, that decision followed principles expounded in *Stone* v. *Farmers' Loan & Trust Co.,* 116 U. S. 307, especially at 331. See 134 U. S. at 455–56. Mr. Chief Justice Waite, who delivered the opinion in the *Stone* case as well as in the earlier decision in *Munn* v. *Illinois,* 94 U. S. 113, was therefore the author of the doctrine of "confiscation" and its corollary, "judicial review." His view was shared by such stout respecters of legislative power over utilities as Mr. Justice Miller (see Fairman, Mr. Justice Miller and the Supreme Court, *passim*), Mr. Justice Bradley (see his dissent in *Chicago, M. & St. P. Ry. Co.* v. *Minnesota,* 134 U. S. 418, 461), and Mr. Justice Harlan. The latter, indeed, agreed with Mr. Justice Field that the regulatory power exercised in the *Railroad Commission Cases,* 116 U. S. 307, constituted an impairment of the obligation of contract. By no one was the doctrine of judicial review more emphatically accepted, and applied in favor of a public utility, than by Mr. Justice Harlan in the decision and opinion in *Covington & Lexington Turnpike Co.* v. *Sandford,* 164 U. S. 578, especially at 591–95.

610

But while this historic controversy over the constitutional limitations upon the power of courts in rate cases is not presented here, if it be deemed that courts have nothing to do with rate-making because that task was committed exclusively to the Commission, surely it is a usurpation of the Commission's function to tell it how it should discharge this task and how it should protect the various interests that are deemed to be in its, and not in our, keeping.