236 F.2d 372
 14 P.U.R.3d 193
 INTERSTATE POWER COMPANY, Northern States Power Company,
Western States Utilities Company, Minnesota Valley Natural
Gas Company, North Central Public Service Company, Kansas
City Power and Light Company (Peoples Gas and Electric
Division), Minneapolis Gas Company, State of Minnesota, City
of St. Paul, Minnesota, and City of Minneapolis, Minnesota,
Petitioners,
v.
FEDERAL POWER COMMISSION, Respondent.
NORTHERN NATURAL GAS COMPANY, a Corporation, Petitioner,
v.
FEDERAL POWER COMMISSION, Respondent.
 Nos. 15412, 15424.
 United States Court of Appeals Eighth Circuit.
 July 9, 1956.
Rehearing Denied Aug. 10, 1956.
 
 P. L. Farnand, Minneapolis, Minn. (G. T. Mullin and John F. Bonner, Minneapolis, Minn., were with him on the brief), for petitioner, Minneapolis Gas Co.
 F. Vinson Roach, Omaha, Neb. (Lawrence I. Shaw, Omaha, Neb., Patrick J. McCarthy, Omaha, Neb., Richard J. Connor, and George J. Meiburger, Washington, D.C., were with him on the brief), for petitioner, Northern Natural Gas Co.
 Carl W. Cummins, St. Paul, Minn., for petitioner, Northern States Power Co.
 William R. Duff, Washington, D.C. (John W. Scott, Washington, D.C., Robert W. Perdue, Washington, D.C., and Norman H. Nitzkowski, Mankato, Minn., were with him on the brief), for petitioner, Minnesota Valley Natural Gas Co.
 Clement F. Springer and Francis T. Crowe, Chicago, Ill., for petitioner, Interstate Power Co.
 Ned Willis, Peoria, Ill., for petitioner, North Central Public Service Co.
 Irving Fane, Arthur J. Doyle, Kansas City, Mo., and Kyle D. Williams, Jefferson City, Mo., for petitioner, Kansas City Power & Light Co. (Peoples' Gas & Electric Division); Henry M. Gallagher, Mankato, Minn., for petitioner, Western States Utilities Co.
 Miles Lord, Atty. Gen. and Joseph J. Bright, Asst. Atty. Gen., for petitioner, State of Minnesota.
 Marshall Hurley, St. Paul, Minn., for petitioner, City of St. Paul, Minnesota, and Charles A. Sawyer, Minneapolis, Minn., for petitioner, City of Minneapolis, Minnesota, were on the briefs.
 W. Russell Gorman, Atty., Federal Power Commission, Washington, D.C. (Willard W. Gatchell, Gen. Counsel, and Lambert McAllister, Asst. Gen. Counsel, Federal Power Commission, Washington, D.C., were with him on the brief), for respondent, Federal Power Commission.
 Lloyd J. Marti, Lincoln, Neb., for intervenor, Central Electric & Gas Company (Raymond A. Smith, Council Bluffs, Iowa, for intervenor, Council Bluffs Gas Co.)
 Hubert C. Jones, Des Moines, Iowa, for intervenor, Iowa Power and Light Co.
 George C. Pardee, Omaha, Neb., for intervenor, Metropolitan Utilities District of Omaha, were with him on the brief), for intervenors.
 Before SANBORN, WOODROUGH and JOHNSEN, Circuit Judges.
 WOODROUGH, Circuit Judge.
 
 
 1
 Northern Natural Gas Company, seven of its customers located in the northern part of its service area, the State of Minnesota, and its Twin Cities, St. Paul and Minneapolis, are petitioners in these consolidated cases and they seek review under Section 19(b) of the Natural Gas Act, 52 Stat. 821, 831, 15 U.S.C.A. §§ 717 et seq., 717r(b), of the Federal Power Commission's Order accompanying and based upon its Opinion No. 281 in Docket G-2217, issued May 20, 1955, finding the collection of uniform rates and charges by Northern Natural Gas Company, a natural gas company under the Natural Gas Act, to be unjust, unreasonable, unduly discriminatory and preferential, and ordering Northern to file revisions of its F.P.C. Gas Tariff.
 
 
 2
 The proceedings before the Commission followed upon Northern's filing revised tariff sheets with the Commission on June 6, 1953, providing for increases in its rates uniformly charged to all of its resale customers except in the Argus system. The Commission commenced a hearing and temporarily suspended such increase tariff sheets by Order dated July 24, 1953. Numerous customers of Northern were permitted to intervene in the proceedings and two of these customers, Council Bluffs Gas Company and Central Electric and Gas Company, complained in their petitions that, as they were located closer to the supply of natural gas, Northern's system of charging uniform rates was unduly discriminatory as to them and that it was unduly preferential to others farther removed from the source, and they requested that the Commission establish service zones and differentials in rates in divisions of Northern's service area to eliminate the discrimination and preference.
 
 
 3
 Hearings were begun before a Trial Examiner, but on January 21, 1954, agreement was reached by all parties to the proceedings with respect to the increases in rates and charges to be made immediately effective on Northern's system. The issue however as to establishing service zones and differentials in rates in different zones as requested by the said customers was not agreed to but was deferred by stipulation for later hearing and determination. The stipulation included the following:
 
 
 4
 'It is agreed that this settlement will dispose of all matters involved and issues presented in this proceeding, excepting the single issue respecting zones of service and differentials in rates between zones. It is further agreed that further hearings herein respecting such issue shall be had at the earliest practicable date and the cost of service hereinbefore set forth and agreed upon for the purposes of this settlement shall be used to the extent that cost of service is involved.
 
 
 5
 'For the purposes of this settlement it is further agreed that the decision of the Commission respecting such issue of service zones and rate differentials, if it requires a change in the revised rate schedules filed pursuant to Section 1 hereof, shall not be made effective prior to December 27, 1954, nor result in revenues less than the agreed cost of service. It is also agreed that, if so required by decision of the Commission on further hearings herein, Northern shall incorporate in revised rate schedules filed to become effective on or after December 27, 1954, the methods and principles found by the Commission, subject to the judicial review, to be proper as to zone and rate differentials with due regard to the recovery of reasonable cost of service.'
 
 
 6
 On January 28, 1954, the Commission issued an Order approving the stipulation and requiring Northern to file tariff revisions in accordance with it. The Order also provided that 'the record in this proceeding shall remain open for further hearings to be held commencing March 22, 1954, * * * respecting the single remaining issue concerning service zones and differentials in rates in areas served by Northern.'
 
 
 7
 Northern filed the required tariff revisions and the hearing in respect to zoning and differentials in rates was in due course convened before the Presiding Examiner. Northern's three customers, Central Electric and Gas Company, Council Bluffs Gas Company and Metropolitan Utilities District of Omaha, located in the intermediate area of Northern's service, called witnesses, introduced evidence and argued as proponents of zoning and rate differentials, and all of the other intervenors participating in the proceeding and Northern joined in presenting evidence and argument in opposition thereto.
 
 
 8
 The Presiding Examiner issued decision on November 18, 1954, after extended hearings and submission of briefs, finding that Northern's existing uniform rate was not unduly discriminatory or preferential, and that the 'public interest does not now require establishment of service zones or zone rates.'
 
 
 9
 Exceptions were filed to the Decision by the three proponent companies and by counsel for the Commission's staff to which Northern and other opponents of zoning answered, and the Commission, sitting en banc, heard oral argument on the exceptions and answers.
 
 
 10
 On May 20, 1955, the Commission issued Opinion No. 281 and accompanying Order by which it found that the use of system wide rates by Northern is unduly discriminatory and preferential and directed Northern to divide its system into three zones with a different rate for each zone.
 
 
 11
 Northern's pipe-line transmission system is about 800 miles in length, extending from the Panhandle Field in Texas and the Hugoton Field in Kansas and Oklahoma to a point near the Twin Cities of St. Paul and Minneapolis and is, at its maximum, approximately 300 miles in width. In addition to the gas purchased from producers in these fields, Northern also takes delivery of substantial volumes of gas near Wasson, Texas, from Permian Basin Pipeline Company, a subsidiary of Northern. Permian in turn purchases natural gas in the Permian Basin area in west Texas and eastern New Mexico, some 400 miles south of the other gas fields supplying Northern. Thus Northern's system is, in that aspect, extended to a distance of about 1,200 miles.
 
 
 12
 Natural gas transported through this system is sold to other utilities at points in Kansas, Nebraska, Iowa, South Dakota, and Minnesota for resale to consumers in these states. Deliveries to these distribution company customers of Northern are effected at many widely scattered points requiring the transmission of the gas through Northern's system for varying distances ranging from 179 miles to 803 miles from the source of gas supply.
 
 
 13
 Northern serves one distributing company in the State of Kansas, the Kansas Power and Light Company. Deliveries to this customer are made at 15 separate points requiring transmission through Northern's facilities of distances ranging from 179 to 322 miles from the source of gas supply. Northern serves 26 other utilities in the States of Nebraska, Iowa, South Dakota, and Minnesota. Sales to these customers for resale are made at 126 points on Northern's system ranging from 390 to 803 miles along the system.
 
 
 14
 Zone 1, as prescribed by the Commission, embraces all sales requiring transmission of gas for a distance of 191 miles beyond Bushton, Kansas, and also includes all sales made south of Bushton. Zone 2 embraces all sales made on the east and west legs of Northern's main transmission line up to approximately 190 miles beyond Zone 1. Zone 3 includes all sales requiring transmission of approximately 180 miles on the west, and 183 miles on the east legs of the main transmission line beyond the northern boundary of Zone 2.
 
 
 15
 The Commission ordered Northern to file revised rate schedules to be effective as of June 27, 1955, (originally May 27, 1955) providing for a two cents per Mcf differential in average revenue for sales in each zone with the lowest rate in Zone 1 and the highest in Zone 3. This was stated to be 'only an interim rate subject to subsequent adjustment and possible refund.'
 
 The Commission was unanimous:
 
 16
 1. In finding that Northern's uniform rates were unduly discriminatory;
 
 
 17
 2. In finding that the establishment of zones with proper differentials in the rates was necessary to eliminate this discrimination;
 
 
 18
 3. In establishing the three zones and fixing their boundaries;
 
 
 19
 4. In finding the differential in average cost of service between zones 2 and 3 to be 3.06 per Mcf.
 
 
 20
 The majority opinion concluded that a differential in rates between zones of only 2 cents per Mcf should be made effective 'at this time on an interim basis, subject to subsequent adjustment and possible refund.' Two of the Commissioners dissented from the Opinion on the ground that the indicated cost differential was shown to be 3.06 cents per Mcf from zone to zone and that an initial rate differential of 2 1/2 cents per Mcf 'would be more equitable,' even if it be recognized that 'some softening of the impact may be appropriate.'
 
 
 21
 Applications for rehearing were filed with the Commission by Northern and by those customers who are the petitioners here in No. 15,412 and were denied, and the filing of the instant petitions for review in this Court followed. Meanwhile, Northern, as required by the Commission's Order accompanying Opinion No. 281, has filed revised rate schedules to reflect the service zones and zone rate differentials. This Court has subsequently accorded a partial stay of the Order.
 
 
 22
 Section 4(b) of the Act, 15 U.S.C.A. § 717c(b), prohibits any natural gas company from making or granting any undue preference or advantage to any person, or subjecting any person to any undue prejudice or disadvantage with respect to any transportation or sale of natural gas subject to the jurisdiction of the Commission, and Section 5(a), 15 U.S.C.A. § 717d(a), empowers and requires the Commission to determine the just and reasonable rate, charge or practice to be observed by a natural gas company and to fix the same by order.
 
 
 23
 Section 5(a) also contains a Proviso 'That the Commission shall have no power to order any increase in any rate contained in the currently effective schedule of such natural gas company on file with the Commission, unless such increase is in accordance with a new schedule filed by such natural gas company.'The opponents of zoning contended before the Trial Examiner and before the Commission, and now insist here, that the Proviso of 5(a) deprives the Commission of power to cause Northern to charge any higher rate in any zone it might set up than was shown for the same area in the currently effective schedule for the same area. They take the position that the establishment of zones and differentials in rates involved an increasing of rates in zone 3 beyond the rate for the same area contained in the currently effective schedule of the natural gas company; and that the Commission was accordingly without jurisdiction and there should be dismissal for want of jurisdiction.[1]
 
 
 24
 The Commission in reply to this contention pointed in its Opinion to the positive duty imposed upon it by the statute to determine just and reasonable rate charges and practices and to prevent any undue discrimination with respect to the sale of natural gas, and it observed:
 
 
 25
 'Undue discrimination or preference, as found to exist by reason of the present rate practice of Northern, may be eliminated in several ways, of which an increase in rates for certain service is only one. Section 5(a) specifically provides also that 'the Commission may order a decrease where existing rates are unjust, unduly discriminatory, preferential, or otherwise unlawful, or are not the lowest reasonable rates.' It would also be quite proper for the Commission, upon the finding of undue discrimination or preference under the facts of this case, to determine appropriate zones of service and require Northern to file appropriate rates which would not be unduly discriminatory or preferential. Federal Power Commission v. Natural Gas Pipeline Co., 315 U.S. 575, 583-585, 62 S.Ct. 736, 86 L.Ed. 1037. And the Commission may, as we do here, in the circumstances of a particular case merely determine and fix the differential in rates that is reasonable and necessary to eliminate existing unlawful discrimination and preference, leaving to the company the decision as to how such differential shall be incorporated into its rate schedules. As the Supreme Court has said, Id., 315 U.S. at page 586, 62 S.Ct. at page 743:
 
 
 26
 'The Constitution does not bind rate-making bodies to the service of any single formula or combination of formulas. Agencies to whom this legislative power has been delegated are free, within the ambit of their statutory authority, to make the pragmatic adjustments which may be called for by particular circumstances.'
 
 
 27
 The record herein shows that these present proceedings before the Commission were initiated by Northern. Northern filed its revised tariff sheets calling for higher rates on June 6, 1953. But the higher rates called for were uniform rates for the system and there was the answering claim of the proponents of zoning and rate differentials that the uniform rates of those tariff sheets unduly discriminated against them and that the discrimination should be eliminated by zoning and rate differentials. The Commission manifestly became possessed of jurisdiction of the whole of the controversy as to the raising of its rates and as to discrimination therein, and, although agreement was arrived at by the parties concerning uniform interim rates to be charged, the record in the proceeding was kept open so as to retain for the Commission's determination the duly presented issue of undue discrimination and removal thereof by fixing zones and differentials. Such retention of the issue by the Commission was a part of the agreement of the parties and was included in the approval of the agreement by the Commission. Nothing occurred to divest the Commission of the jurisdiction conferred upon it to decide and act upon the whole issue presented to it.
 
 
 28
 The Commission's conclusion that it had jurisdiction is strengthened by the decision of the Supreme Court in United Gas Pipe Line Co. v. Mobile Gas Service Corp., 350 U.S. 332, 76 S.Ct. 373, 379. The Court there declares that 'The basic power of the Commission is that given it by § 5(a) to set aside and modify any rate or contract which it determines, after hearing, to be * * * 'unduly discriminatory, or preferential'. * * * Section 5(a) authorizes the Commission to investigate rates not only 'upon complaint of any State, municipality, State commission, or gas distributing company' but also 'upon its own motion'. Thus, while natural gas companies are understandably not given the same explicit standing to complain of their own contracts as are those who represent the public interest or those who might be discriminated against, there is nothing to prevent them from furnishing to the Commission any relevant information and requesting it to initiate an investigation on its own motion. And if the Commission, after hearing, determines the contract rate (of a natural gas company) to be so low as to conflict with the public interest, it may under § 5(a) authorize the natural gas company to file a schedule increasing the rate.'
 
 
 29
 So, in this case, if Northern's uniform rate was, as alleged, unduly discriminatory, and if it was necessary or appropriate for the Commission to establish zones and differentials in order to eliminate such discrimination, nothing contained in the Proviso of 5(a) restricted the Commission's power to do so. The Commission would not be violating the Proviso of 5(a) by ordering Northern to reduce its existing rates in Zone 2 and authorizing it to increase its existing rates in Zone 3, through the use of an approved differential, in order to balance its revenues. This is what we construe the effect of the Commission's decision and order to be.
 
 
 30
 The revised tariff filed by Northern on July 2, 1954, was accepted by the Commission as compliance with the requirements of Opinion 281 and Order. It was made effective for an interim period pending final decision by the Commission after hearing in Docket No. G-2505 as to the just and reasonable charges Northern should be permitted to demand and collect in connection with new tariff sheets raising rates filed by it. Such new tariff sheets were filed by Northern on July 2, 1954, designed to increase its revenues from jurisdictional sales $8,128,405 annually over the revenues estimated to be produced by the schedule made effective pursuant to the approved settlement in Docket No. G-2217 proceeding. The zone rates and charges were made subject to refund by Northern of such portion thereof as might be subsequently ordered by the Commission after further proceedings in Docket No. G-2505, including hearings. There is and can be no question that the Commission was given the power under the Act to determine whether or not a natural gas company's uniform rates are unduly discriminatory, and it is equally clear that where such discrimination is found to exist, the Commission was empowered to eliminate it by establishing zoning and rate differentials.
 
 
 31
 We hold that the Commission regularly acquired and retained jurisdiction in respect to zoning and resulting rate differentials for Northern Natural Gas Company in this case.
 
 
 32
 The grounds upon which the petitioners seek reversal of the Commission's Opinion No. 281 and Order, additional to the matter of the Proviso of 5(a), are stated in somewhat different forms in their several briefs, and without reiterating the characterizations of alleged errors as 'arbitrary,' 'capricious,' 'abuse of discretion,' 'contrary to law,' etc., we epitomize those contentions meriting discussion as follows:Petitioners contend:
 
 
 33
 1. That the finding that the distance Northern transmits the gas it sells is the controlling factor in determining its cost of transmission so that its charging uniform rates throughout its service area (except the Argus area) was unduly discriminatory and preferential was not based on and is not supported by substantial evidence;
 
 
 34
 2. That the zone lines have been fixed without substantial evidence and upon evidence outside the record;
 
 
 35
 3. That the Commission erred in establishing the zones upon consideration of evidence not shown in the record in respect to new construction authorized in Docket No. G-2063 and without determining costs of the new construction;
 
 
 36
 4. That the Commission erred in establishing lines of the zones without giving petitioners a hearing upon a proposal to establish the particular lines fixed;
 
 
 37
 5. That there was no evidence of changed conditions justifying departure from the Commission's approval of Northern's uniform rates. Colorado Interstate Gas Co. v. Federal Power Commission, 324 U.S. 581, 65 S.Ct. 829, 89 L.Ed. 1206;
 
 
 38
 6. That the Commission erroneously failed to find as shown by the evidence that increased rate in Zone 3 is likely to price gas out of the industrial market in that area.
 
 
 39
 1. Claimed insufficiency of the evidence.
 
 
 40
 The Commission declared the basic question for its decision in the proceeding was 'whether the present rate structure of Northern is unduly discriminatory or preferential' in contravention of Section 4(b), 15 U.S.C.A. § 717c(b), which provides 'No natural-gas company shall, with respect to any transportation or sale of natural gas subject to the jurisdiction of the Commission, (1) make or grant any undue preference or advantage to any person or subject any person to any undue prejudice or disadvantage * * *.' And having considered the question and evidence bearing on it, the Commission stated:
 
 
 41
 'The matter now before us involves a determination as to whether unlawful discrimination or preference is created by the exaction from all customers on a transmission system of identical, uniform rates when the points of delivery to the several customers are as much as 600 miles apart. We find, under the circumstances of this case, that Northern's uniformly applicable rates and charges are unduly discriminatory as to some of its customers and unlawfully preferential as to others.'
 
 
 42
 The Commission included the declaration in its opinion that 'it is a simple economic fact that the delivery cost of natural gas increases in close proportion to the length of the transmission line of any given size' and it adverted in that connection to the fact in evidence that 'transmission expense amounting to $50,500,000 constitutes 55 per cent of Northern's total cost of service and 96 per cent of the total for items other than gas production expense.' Inasmuch as natural gas can only be moved through the pipe by application to it of force that costs money to apply, there has been no attempt to dispute 'the simple economic fact' of the Commission's finding where one sized pipe is used. The cost per Mcf is less where larger pipe is used and kept filled under greater constant pressure.
 
 The Commission further declared:
 
 43
 '* * * unless other circumstances are present which outweigh the importance of the length of transmission required to effect delivery, the distance factor is the prime determinant of the cost of rendering service. Since in our view of this record there are no such circumstances present to counterbalance the distance factor, we conclude that the distance of transmission required to effect deliveries at the various points of sale by Northern reflects with reasonable accuracy the relative cost of providing service to its customers. We further find and conclude that Northern's present practice of demanding and collecting uniform rate throughout the length and breadth of its area of service for the sale of natural gas for resale is unjust, unreasonable, unduly discriminatory and preferential. This practice results in the shifting of transmission cost from those whose service requires its incurrence by reason of the greater transportation distances to others who are not responsible for such cost-- and who are not benefited correspondingly.'
 
 
 44
 In reaching its determination that there were no other circumstances present to counterbalance the distance factor, the Commission gave consideration to the cost of service agreed upon in the stipulation and to (a) the distribution of sales along the route of Northern's system and the volume of gas sold; (b) the load factor of such sales; and (c) the comparative benefits to customers situated in the upper and lower reaches of the principal market area derived from the lowered unit cost resulting from the large volumes of gas transmitted through the system.
 
 
 45
 (a) As to distribution of sales, the Commission found that, although there are 126 points at which jurisdictional sales and deliveries are effected in the area north of the Kansas-Nebraska boundary, wherein 99.65 per cent of the total estimated jurisdictional sales were made sales at 8 principal points represented over 71 per cent of Northern's total estimated jurisdictional sales in 1954. The facts concerning deliveries at these points are shown in the following tabulation:
 
 
 46
 Weighted
 Percentage Average
 Estimated of Total Percentage Miles
 Annual Annual Load of Haul
 Delivery Sales 1954 Jurisdictional Factor Transmission
 Point (Mcf) Sales of Sales System
Lincoln .......... 10,866,200 4.63 76.19 447.62
Omaha ............ 26,345,000 11.23 78.27 480.61
Co. Bluffs ........ 6,053.600 2.58 77.02 483.96
Sioux City ........ 9,826,400 4.19 75.87 560.46
Des Moines ....... 25,352,400 10.81 81.75 625.91
Sioux Falls ....... 7,358,800 3.14 81.10 642.92
Minneapolis ...... 55,013,000 23.45 70.30 795.59
St. Paul ......... 25,922,200 11.05 83.27 803.37
 ----------- -------------- ---------- ------------
 Total ......... 166,737,600 71.08 76.41 666.65
 Ave. Ave.
Jurisdictional ----------- ----- ----- ------
Sales System
 Total ......... 234,588,200 100.00 76.39 662.00
 Ave. Ave.
 ----------- -------------- ---------- ------------
 
 
 47
 The record also shows for each other point of delivery by Northern the amount of gas delivered annually, the volume of gas delivered during the period of peak demands, and the miles of transmission required to effect delivery at such points of deliveries. It was fairly inferable from that evidence that there is no such concentration of sales in a single area as would countervail against the factor of distance, the mileage of haul, and the Commission so found. The Commission further found that 'While it is true that 37.5 per cent of the total estimated jurisdictional sales for 1954 were made at or near the terminus of Northern's system, the distribution of the remainder of these sales along the system is such as to foreclose a finding that sales at the farthest points of the system are so predominate as to be of controlling consideration rather than the distance factor.' This finding of the Commission is supported by the following tabulation in the Opinion No. 281 showing the distribution of jurisdictional sales along the length of Northern's system and is corroborated by the extensive detailed evidence respecting each and every point of delivery.
 
 
 48
 Distance in Estimated Percentage
 Miles From Jurisdictional of Total
 Source of Sales for Year Jurisdictional
 Gas Supply 1954 (Mcf) Sales
 0-400 ........... 1,826,400 0.778
401-500 .......... 47,520,800 20.257
501-600 .......... 20,025,500 8.537
601-700 .......... 61,954,900 26.410
701-803 ......... 103,260,600 44.018
 
 
 49
 (b) Turning to a consideration of the load factor of jurisdictional sales on the system, the Commission found that the load factor of sales in the State of Minnesota, the most remote from the source of gas supply, was the lowest of any state served by Northern and lower than the system average. The annual load factor of jurisdictional sales in Minnesota was 73.80 per cent.[2] In other states it ranged from 76.92 per cent to 80.74 per cent, with a system average of 76.38 per cent. Load factor as here used reflects the relationship between average daily deliveries and the deliveries in the peak period. The matter of load factor is of importance because, for any given length and size of transmission line, delivery cost per Mcf increases as the load factor at which the line is operated decreases. As the Commission pointed out: 'This generality simply gives expression to the mathematical fact that more complete utilization of any given capital facilities involving fixed costs will result in declining unit costs.'[3] Therefore, as the Commission properly found, the lower load factor of sales in the State of Minnesota tended to depress the load factor of the system and thus contributed to a higher unit cost for all gas delivered from the system.
 
 
 50
 (c) As to the comparative benefits, the Commission had before it the testimony of expert witnesses presented by the customer Proponents of zones and rate differentials and by the Commission's staff. The witness presented by the Proponents, Mr. N. Knowles Davis, has been the Chief Engineer of the Georgia Public Service Commission for about twenty years and sometimes serves as a private consultant, as in this proceeding. It was Mr. Davis' opinion that, if the total cost of service of a natural-gas pipe-line system is to be equitably distributed among the customers of the system, it is essential that recognition be given to the cost of service by rate zones; that to have a flat demand and commodity rate uniformly applicable throughout the length of a long pipe line results in discrimination; that customers located in a zone nearer the source of gas supply should not contribute to a rate of return on plant facilities which are in no way used to furnish service to the zone in which they are located; and that the principle of cost allocation by rate zones and the establishment of rates based on such cost allocation is sound and logical and equitable to all concerned.
 
 
 51
 This witness also expressed the opinion that cost of service varies with the distance transported; and that recognition of this variable cost of service with distance requires zone rates for the transportation of natural gas if equitable charges for the service are to be applied.
 
 
 52
 With particular reference to the system of Northern, Mr. Davis expressed the following opinions, which were arrived at after a detailed study of the system and operations of the company:
 
 
 53
 'In the first place, the Northern Natural System extends between eight and nine hundred miles geographically from the source of its supply to its terminus.
 
 
 54
 'In the second place, the line does not alone serve a single primary area at or near its terminus. This is not a case where the pipeline extends from its source of supply to a single market at its terminus.
 
 
 55
 'In my opinion a line of this length with a market distributed as it is along this line requires the establishment of rate zones and zone rates in order to equitably distribute the total cost of its service among its market customers.
 
 
 56
 'In my opinion zone rates are required by reason of the length of a line and the distribution of deliveries along a line. When you have a relatively long line and substantial market areas at considerable distance from one another, it becomes essential, in my view, to provide zone rates in order to eliminate what seems to me to be unreasonable discrimination.'
 
 
 57
 This witness was of opinion that, although capacity of the line enters into it and to quite an extent the distribution of the road along the line, the length of the line is more important than any other factor.
 
 
 58
 The expert witness presented by the Commission's staff, Mr. Joseph J. Curry, also expressed the opinion that the then existing rate structure of Northern providing uniform rates throughout the system was inequitable, and that the establishment of service zones and zone rate differentials on a proper basis would result in a more equitable distribution and assessment of the transmission cost of service. In the opinion of this witness the fixing of service zones with proper rate differentials was required to give recognition to the miles of haul required in rendering service to the various customers of Northern.
 
 
 59
 The record also shows that the Commission gave due consideration to the evidence against zoning. It weighed the testimony of witnesses called by the petitioners herein and their studies of Northern, its history, operations and customer relations. The Commission also had before it and considered the carefully prepared decision of the informed Trial Examiner as well as the briefs and arguments of the opponents of zoning. We also have considered the same, and we are satisfied that there is substantial evidence supporting the findings and conclusions of the Commission that Northern's uniform rate structure subjects some of its customers to undue discrimination and is unduly preferential to others. Even though a different conclusion could have been drawn, as it was by the Trial Examiner, it cannot be held that the Commission was plainly in error. Section 19(b) of the Natural Gas Act makes such findings conclusive when they are so supported, 15 U.S.C.A. § 717r(b), and they should be affirmed. Colorado Interstate Gas Co. v. Federal Power Commission, 10 Cir., 142 F.2d 943, 961, affirmed 324 U.S. 581, 65 S.Ct. 829, 89 L.Ed. 1206.
 
 
 60
 2. As to the zone lines fixed by the Commission.
 
 
 61
 The Commission found on study of the plans for zoning that were proposed by the expert witnesses and explained by testimony that, although each tended to eliminate some discrimination resulting from Northern's uniform rate, each left certain unjust inequalities. The zone plan referred to as Staff Proposal B, which was urged as most appropriate for adoption by the Staff, is basically the same as that decided on by the Commission except that the Commission, on closer study, found instances where sales at some points near the proposed zone border line would be made at the lower rate, although actually requiring transmission through main and lateral line facilities for a greater total distance than some other sales to be made at a higher zone rate. The principal difference between the Staff's recommended zoning and that fixed by the Commission is found in the areas in the vicinity of Beatrice, Paullina and Ogden compressor stations. In these areas where the Staff proposed that the zone boundaries be fixed at the compressor stations, the Commission modified the zone boundaries to include sales immediately beyond and in the vicinity of the stations. The Commission simply brought the zones in a little closer conformity to its finding that the distance of the haul was the controlling factor in determining cost of transmission.
 
 
 62
 As noted above, it was a part of the Commission approved agreement that Northern should incorporate in revised rate schedules filed to become effective on or after December 27, 1957, 'the method and principles found by the Commission, subject to judicial review, to be proper as to zone and rate differentials with due regard to the reasonable cost of service.' But when Northern filed its new schedules for increased rates and charges on July 2, 1954, which were first suspended but later made effective as of December 27, 1954, subject to refund, the Commission had not issued its Opinion and Order as to zones and differentials, and when it did issue them on May 20, 1955, Northern's new rates had become (conditionally) effective upon a uniform basis.
 
 
 63
 Accordingly, the Commission undertook to determine by cost allocation principles, referred to in the Opinion, what the rates for the zones would be if computed on the full cost of service claimed by Northern. As so computed, the rates indicated that the differential would be 3.06 cents per Mcf. But the Commission did not impose that differential. It ordered the revised schedules to reflect a differential between zones of 'approximately 2.00 cents per Mcf.'
 
 
 64
 We think that the Commission made no more use of the record evidence it found furnished by Northern in Docket G-2505 and Docket G-2063 (outside of this G-2217 record) than to verify certain mathematically computed measurements of distances and to assure itself that the zone differential it prescribed (subject to reconsideration and refund in the pending Docket G-2505 proceeding) was substantially less as appears without dispute than would be shown on the hearing.
 
 
 65
 We find therefore that the use the Commission made of Northern's record evidence in Docket G-2505 that was not included in the hearing of these proceedings of Docket G-2217 was not the basis of its determination of discrimination and to the extent that that evidence influenced the rate differential arrived at, it tended to and was used to reduce the amount thereof and did not prejudice the petitioners. There was no denial of due process.
 
 
 66
 3. As to new construction.
 
 
 67
 The record shows that at the time of the hearing before the Examiner, March through June, 1954, Northern had commenced construction of lateral lines to some 60 or 70 new jurisdictional sales communities, such service having been authorized by Commission Opinion and Order No. 268 issued March 11, 1954, Docket G-2063. These laterals were completed by December 27, 1954, after the hearing before the Examiner herein was terminated and his decision issued. The new construction cost about $14,000,000 and the new sales and related revenues estimated increased investment and were reported to the Commission by Northern in connection with its filing of new schedules for increased (uniform) rates and charges on July 2, 1954, above referred to. The Commission suspended the schedules but they were made effective and uniform rates were collected under them as of December 27, 1954, subject to refund.
 
 
 68
 As set forth above, it was part of the Commission approved stipulation for settlement that Northern should incorporate in its new schedules, which were to become effective December 27, 1954, 'the methods and principles found by the Commission, subject to judicial review, to be proper as to zone and rate differentials with due regard to the recovery of reasonable cost of service.'
 
 
 69
 In view of the new construction and the new rate filings, the Commission did not attempt to hold Northern to the precise terms of the stipulation or the computations that were submitted with it. But it is clear on the record that, if it should appear in the impending hearings in the proceeding in Docket G-2505 that the differentials ought to be less than 2.00 cents per Mcf prescribed or that an excessive rate is being or has been collected, the opportunity is there presented for the Commission to make adjustment and require refunds. The present rates of Northern are effective at this time on an interim basis. We find no impediment to the decision or justification for reversal of its Opinion in the fact that there was this new construction going on during the hearings and completed afterwards. There is no reason to infer that the new construction changed the basic conclusions upon which the Commission acted.
 
 
 70
 4. As to the lack of hearing on the particular zone lines prescribed.
 
 The Commission observed:
 
 71
 'In theory, the ideal non-discriminatory, and non-preferential rate structure would be one designed to assess each point of sale and delivery with the total of the various cost components incurred in the rendering of service to each point. But any attempt to arrive at such perfection would not only be delusory, Colorado Interstate Gas Co. v. Federal Power Commission, 324 U.S. 581, 589 (65 S.Ct. 829, 89 L.Ed. 1206); Hamilton, Cost as a Standard of Price, supra (4 Law and Const.Prob. 321); (F.P.C.) Op.No. 225, In the Matter of Atlantic Seabord Corporation, et al., pp. 17-19 (mimeo. ed.), but also impracticable and infeasible from both the management and regulatory point of view. In the circumstances of this case the only practical and reasonable approach to an equitable solution is the establishment of service zones-- with rate differentials-- as urged by the Proponents of zoning and the Staff.'[4]
 
 
 72
 After noting the zoning proposals advanced by the Proponents of zoning, the four alternative bases for zoning proposed by the Staff, and the voluntary suggestion of the Presiding Examiner as to what he considered would be proper service zones, the Commission stated:
 
 
 73
 'After detailed consideration of the record, we have concluded that none of the zoning plans presented by the Proponents and the Staff or the modified plan which the Examiner finds most feasible are appropriate and acceptable. While each might as claimed tend to eliminate or reduce the discriminations and preferences existing under the present rates of Northern, the facts are clear that other inequities would be created by the establishment of zones according to any of these plans.
 
 
 74
 'Under each of these plans, including that found most proper by the (Presiding Examiner's) Decision, determination of the zone in which a particular sale is made would be fixed by the point on the main line from which the lateral line enabling such sales takes off. All of Northern's sales of gas for resale are effected at the city gates of the communities served. In most instances these sales are made at the terminii of lateral lines branching from the main line transmission facilities. Thus, the total distance of transmission to each point of delivery is represented by the aggregate of the mileage of the transmission through both the main line and the lateral line serving each point of sale. As a result, as is elaborately pointed out by the Opponents, under each of these methods of zoning the total mileage of transmission to certain points in zones closer to the source of supply is greater than the mileage to other points of sale in zones farther removed from the source. Under each of the plans considered, including the Examiner's, deliveries to certain points requiring the greater mileage of transmission would be made at the lesser rate.'
 
 
 75
 Whereupon, after noting these findings were sufficient in the Commission's view 'to condemn each of these methods of zoning' advanced by the Proponents and the Staff, the Commission pointed out other additional reasons why it did not find any of such proposals wholly acceptable. After analyzing the evidence, it concluded:
 
 
 76
 '* * * that the most appropriate and practicable method would be the establishment of three zones on Northern's system with zone boundaries as depicted on the map following this page. * * * This plan, in our view, provides the most effective and equitable basis for eliminating the present unlawful discrimination and preference.
 
 
 77
 'As noted previously, the Bushton Compressor Station is the last point of input of gas into the mainline facilities. Under this plan, the service area north of the Bushton station wherein more than 99 per cent of the jurisdictional sales are made is divided into three zones which are as nearly equal as they can reasonably be so far as transmission distances are involved.'
 
 
 78
 The petitioners contend that when the Commission decided to reject the several defined zones which were proposed and opposed on the hearing before the Trial Examiner, it should have given notice and held a hearing in respect to the particular zone lines which it contemplated establishing. They argue that they were denied due process in this respect.
 
 
 79
 It cannot be denied that the course contended for would have been held appropriate if the Commission had followed it, but we do not find a denial of due process in the course that was followed. The Commission is 'one of those agencies presumably equipped or informed by experience to deal with a specialized field of knowledge, whose findings within that field carry the authority of an expertness which courts do not possess'. Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456. It has been delegated by the Congress to administer the Natural Gas Act with power 'to draw inferences from (the facts).' Its 'function is not only to appraise the facts and to draw inferences from them but also to bring to bear upon the problem an expert judgment'. United States v. Detroit & Cleveland Navigation Co., 326 U.S. 236, 241, 66 S.Ct. 75, 77, 90 L.Ed. 38, and particularly its findings and directives need not be based directly on the expressed opinion of experts, but may be drawn from the facts. Market Street Ry. Co. v. Railroad Commission, 324 U.S. 548, 559, 560, 65 S.Ct. 770, 89 L.Ed. 1171.
 
 
 80
 In this instance the evidence before it, taken in sixteen days of hearing and including some 2,000 pages of testimony and 46 exhibits, many of which are quite voluminous, was sufficient to enable the Commission to establish just and proper zone lines. It had to make only slight changes in the zone lines testified about by the experts. In the hearings, counsel for the Opponents brought out on cross-examination of the Staff witness concerning the Staff's proposed zones, instances where a higher rate would be charged at points near the zone boundaries although the total distance of transmission to the points of delivery was less than to other points where the charge would be less. This inequity was eliminated by the Commission by sharply zig-zagging the zone boundary lines. There is no suggestion of any mistake or oversight in drawing the zone lines as the Commission drew them. If such should arise, it would be for consideration and correction in Docket G-2505.
 
 
 81
 The major defense to the charge that uniform rates were unduly discriminatory was that it was illogical and arbitrary to allocate transmission costs on the mileage basis alone. The petitioners contend that considerations as to volume of gas sold, size of the pipes used, the annual load factor, and competition of other fuels counterbalances the distance factor, so that costs are not in proportion to distance and the public interest is not served by zoning. But the record reflects that the Commission did not fail to consider any of these matters of defense. It had the figures in detail as to each of the factors and the opinions of experts as to the relevancy of each of them to the transmission cost.
 
 
 82
 The petitioners also insisted that several of the elements necessary to make a determination on this major issue were not shown by evidence in the record. Thus, although it was shown that there are about 2,000 miles of branch lines and 3,200 miles of main line and the pipes of the branch lines and of the main lines vary in size, there was no specific finding as to just what effect this variance had on the unit transmission cost. Petitioners presented testimony supported by exhibits tending to show the benefits in costs which consumers below Minnesota derived from the transmission and sale of gas to that area. It was also argued that new construction to serve some sixty or seventy additional communities might affect the conclusion that distance alone was determinable of the cost of transmission.
 
 
 83
 But the conclusion arrived at by the Commission, after considering all the contentions, was that none of these factors nor all together sufficed to overcome the evidence that it was the distance which determined the relative cost of transmitting the gas to the delivery points of the system; and that the cost increased and lessened in direct proportion to the distance. That conclusion was within the province of the Commission.
 
 
 84
 5. As to Commission's former sanctioning of uniform rates.
 
 
 85
 The record shows that the Commission has on several occasions since the effective date of the Natural Gas Act in 1938 adverted to the matter of Northern's uniform rates, at all times consistently charged by it with Commission permission throughout the area of service (except as to the Argus system). In Trunkline Gas Supply Company, Opinion No. 178, Docket No. G-882, 8 F.P.C. 250 (April 29, 1949), the Commission expressly stated that:
 
 
 86
 'It is significant to note that throughout this period of expansion (1945-1949), and taking into consideration the many problems relating thereto from the standpoint of operation, costs and earning, Northern Natural has never seen fit to vary from its policy of a uniform system-wide rate structure for sale from its main line transmission system.
 
 
 87
 'Accordingly, from this present record it appears that Northern should continue its present practice of charging a uniform demand-commodity form of rate for all sale-for-resale services on its main line system after it commences its purchases of gas from Trunkline. This is consistent with Commission's past position in that it held that 'In the absence of compelling reasons to the contrary, it is good and desirable practice to fix rates that are uniform."
 
 
 88
 In State Corporation Commission of Kansas v. Federal Power Commission, 8 Cir., 206 F.2d 690, 713, this court agreed with the conclusion of the Commission then under review that the Proponents of zone rates for Northern had 'made no record in (the) case to afford a basis for the establishment of such rates.' It is also evident that the Commission Staff thought that it was settled in the Trunkline case that, until compelling reasons were shown to the contrary, Northern should charge uniform rates.
 
 
 89
 Petitioners' contention is to the effect that the Commission was precluded from fixing zones and differential rates for Northern.
 
 
 90
 We do not so conclude. It appears that this case presents the first instance in which the Commission has made what it has deemed to be a sufficient study of the facts to enable it to make definite and positive finding that Northern's uniform rates are in fact unduly discriminatory. In this case the Commission had available to it at the outset the cost allocations which had been considered and agreed to by all parties to the proceedings and were approved by the Commission. The situation was contrasted with that presented to this Court where conflict continued respecting the allocations. Neither the Commission nor this Court was bound in that respect to Northern's uniform rates except as the Commission was obliged to recognize and permit them unless and until it was proved by substantial evidence that they were unduly discriminatory. We do not find sufficient cause to upset that ruling of the Commission.
 
 
 91
 6. As to pricing gas out of upper zone market.
 
 
 92
 The Commission considered the contention that the increase of rates in zone 3 would result in the loss of industrial sales to competitive fuels, but found the evidence less than convincing. It permitted Northern, if it chooses to do so, to maintain in the rate schedules files pursuant to the Order in the instant matter a uniform commodity charge throughout the system and to adjust the demand component of the rates to provide the differential between zones of approximately 2.00 cents per Mcf at a 70 per cent load factor.
 
 
 93
 Our own consideration of the evidence concerning the effect of the zoning and differential upon competition with other fuels does not compel conclusion, on the present record, contrary to that reached by the Commission. The testimony is meager. The matter is for hearing in G-2505 and the statements concerning it in the Opinion reflect that the Commission will not arbitrarily or unfairly limit the rights of Northern or the interests of its customers in the field of competition.
 
 
 94
 On review of the whole record, we conclude that the Commission has acted in a matter within its jurisdiction; that its findings are supported by substantial evidence and are not contrary to the evidence; that the conclusions are not contrary to law or erroneous; and that the Opinion and Order should be sustained. The points raised and argued in the briefs have been considered, though discussion of some is deemed unnecessary. The Opinion and Order are
 
 
 95
 Affirmed.
 
 
 
 [1]
 Appended to Joint Reply brief of nine petitioners is copy of excerpts from brief filed in Matter of Atlantic Seaboard Corporation, Docket Nos. G-1384 and G-1175 (pp. 3-11), giving legislative history and judicial discussions of Proviso 5(a). Also excerpts from brief in same matter by Lynchburg Gas Transmission Corporation
 
 
 [2]
 The load factor of sales in Minneapolis, the largest single customer was the lowest of the group of major markets
 
 
 [3]
 Citing 'F.P.C. Docket No. G-580, Natural Gas Investigation, Smith-Wimberly Report, page 260; Hamilton Cost as a Standard for Price, 4 Law and Cont. Prob. 321, 330.'
 
 
 [4]
 In effect much of the argument of petitioners here constitutes attack upon this conclusion of the Commission. It is contended that the Commission should have had more data respecting the comparative costs of transmission to all the different areas and points of delivery in the system, but we think the Commission's declaration as to what was practical or feasible from the management and regulatory point of view is entitled to weight and may not be disregarded