(C.D. 4558)

Sweet Briar, Inc. *v.* United States

94

(Decided September 23, 1974)

*Rode & Qualey* (*Ellsworth F. Qualey* and *John S. Rode* of counsel) for the plaintiff.

*Carla A. Hills*, Assistant Attorney General (*Velta A. Melnbrencis* and *Glenn E. Harris*, trial attorneys), for the defendant.

Before RICHARDSON, LANDIS, and NEWMAN, Judges

RICHARDSON, Judge: The merchandise in this case consists of ladies dresses which were manufactured in and exported from the Philippine Islands in 1963 and 1964, classified in liquidation under TSUS item 382.03 upon entry at the port of Atlanta, Georgia, and accorded the duty rate reduction authorized for "Philippine articles" under General Headnote 3(c) of the Tariff Schedules of the United States. The plaintiff protests the reliquidation of 11 entries pursuant to 19 U.S.C.A., section 1521 (section 521, Tariff Act of 1930) under which the reduced duty rate was disallowed as to two of the entries, namely, A188 and A1272, allegedly because the dress material was said to

have been imported into the Philippines directly from Japan and not from the United States, and the values were increased on all of the entries to include an "embroidery charge" said to have been omitted from the invoice values. The reliquidations resulted in increased duties being assessed against the plaintiff, and it filed the instant protest alleging the reliquidations to be illegal.

Plaintiff contends that a reliquidation under section 1521 does not authorize a "reappraisement" of the merchandise, and further, that the evidence does not establish that the district director either made a finding of probable cause to believe that there was fraud or that he could have had probable cause to believe there was fraud in the case.

The case was submitted upon the official papers which were offered by the plaintiff, and documentary evidence and the testimony of two witnesses which was offered by the defendant.

The record shows that the "reliquidations" had their genesis in two reports of customs representatives on the subjects of undervaluation and false invoicing. The first report (exhibit B-1) is authorized by Customs Representative Perry J. Spanos stationed in Hong Kong, and is dated June 19, 1964. It deals with Sweet Briar entries made at ports other than Atlanta. The Spanos report states the relationship between Sweet Briar (the American importer), Kalaw Clothes Factory (the Philippine manufacturer) and Toyo Menka Kaisha (the Japanese seller) as follows:

> Sweet Briar, Inc., of the United States ships United States made [1] (or Japanese made, but dyed and finished in the United States) cloth material on consignment to Kalaw Clothes Factory in Manila. Toyo Menka Kaisha, Osaka, Japan, ships various accessories such as buttons, zippers, belt-backings, hook and eye, on consignment to Kalaw Clothes Factory in Manila.

> Kalaw Clothes Factory cuts and sews the fabric into ladies dresses, suits, and blouses and then ships the garments to Sweet Briar, Inc., of the United States. The payments are arranged as follows: Sweet Briar, Inc., of the United States, advances a letter of credit to Toyo Menka Kaisha of Hong Kong which includes the value of the accessories, the making charges and commission (profit) earned by Toyo Menka. Toyo Menka, Hong Kong, advances a letter of credit to Toyo Menka, Osaka, for the value of the accessories and another letter of credit to Kalaw Clothes Factory in Manila for the making charges. This operation is graphically illustrated on attached Exhibit A.

The "Exhibit A" referred to in the Spanos report also indicates, among other things, that the Sweet Briar payments to Toyo Menka

---

[1] Customs Representative Spanos verified that between June 17, 1963 and February 11, 1964, Sweet Briar made four shipments of synthetic cloth material to Kalaw Clothes Factory totaling 160,000 yards.

Kaisha, Hong Kong, included an amount for "embroidery charges." However, the report asserts that certain embroidery charges incurred in the Philippines on uncut material of American origin shipped there by Sweet Briar were not listed on the invoices covering the finished garments coming back to this country. In this connection the report states:

> The additional embroidery cost has never been shown on any of the invoices of supporting documents. . . .

And the Spanos report goes on to state:

> The reason for the numerous irregularities in the invoices of the instant merchandise listed in the letter from the customs agent in charge, Charleston, South Carolina, dated April 29, 1964 (C–8–50), are possibly due to "slip ups" by the seller in not adding the correct embroidery charges on the final invoice.

The "seller," according to the Spanos report, is Toyo Menka Kaisha, Ltd., of Osaka, Japan, who, the record shows, had also entered into a written contract with Kalaw Clothes Factory to furnish Kalaw with "raw materials" and "supplies" to be made into finished garments and shipped to any destination (except communist dominated territories) as instructed by Toyo Menka Kaisha. ("Exhibit B" of the Spanos report.) And it was the "seller" who controlled the price quotations recorded on the invoices investigated in the Spanos report.

The second report (exhibit B–3) giving rise to the "reliquidations" is authored by Senior Customs Representative Stewart H. Adams, also stationed in Hong Kong, dated July 13, 1965. This report transmits to the customs agent in charge at Savannah, Georgia, certified copies of Philippine customs documents purporting to show "that 21 United States entries were made of other than United States and Philippine materials." The Philippine documents referred to in the Stewart report are said to involve 11 entries made at Atlanta, 9 made at San Francisco, and 1 made at New York. Copies of some of these documents are annexed to the official papers in entry A1272,[2] and consist of: (1) a certificate of inspection, identification, and loading of the merchandise covered by entry A1272 pertaining to 624 dozen ladies dresses issued by the Philippine Embroidery and Apparel Control and Inspection Board, (2) a listing of entry numbers of merchandise imported into the Philippines together with a description and quantity of the merchandise stapled to the reverse side of the aforementioned certificate, and (3) four Philippine customs entries covering rayon and cotton fabrics imported from Japan and bearing entry numbers

---

[2] Documents relating to other entries before the court were not put into evidence inasmuch as it was said that they were no longer available.

which are the same as some of the entry numbers appearing on the aforementioned listing.

On the basis of exhibits B–1 and B–3, among other things, a third report (exhibit B) was compiled, and this by George C. Corcoran, Jr., customs agent in charge at the port of Savannah, who was one of the two witnesses who testified at the trial herein. The Corcoran report was addressed to the district director at Savannah under date of February 14, 1966, and reported alleged violations under 19 U.S.C.A.; sections 1481, 1485, and 1592 against the plaintiff.

With respect to the omission of the embroidery charges reported in exhibit B–1, the Corcoran report states:

> During the investigation in the offices of Kalaw Clothes Factory, it was found that an embroidery charge averaging $9.20 per dozen for dresses, $4.50 per dozen for ladies' suits and $2.54 per dozen for ladies' blouses is incurred during the manufacture of these items; and this charge is not included on the invoices which were filed in support of entries covering the importation of this type of clothing.

And as to the entries at bar, the Corcoran report states:

> . . . A review of the Atlanta consumption entries covering Kalaw's shipments to Sweet Briar, Inc. disclosed the embroidery charges were not shown on the supporting invoices of seventeen entries.

With respect to the matter of false invoicing (i.e., country of origin), the Corcoran report states:

> On June 19, 1964 the Senior Customs Representative, Hong Kong made a report of his investigation, file 8–206 (Exhibit 4) at the factory of Amado L. Kalaw Clothes Factory, Philippine Islands. Investigation showed that Toyomenka Kaisha of Hong Kong actually contracts with Kalaw Clothes Factory to make up blouses, dressses and other items of clothing which are imported by Sweet Briar, Inc.

The report goes on to state:

> On February 8, 1965, I forwarded eighteen Atlanta entries to the Senior Customs Representative, Hong Kong. In a report dated July 13, 1965, the SCR, Hong Kong forwarded Philippine customs documents to this office and a review of these documents disclosed the fabric used in the manufacture of garments covered by six entries were invoiced as material of United States origin when, in fact, the material used was of Japanese origin. . . .[3]

---

[3] At the trial Mr. Corcoran was asked on direct examination by Government counsel how he determined that the material used in the manufacture of the merchandise covered by entry A1272 was of Japanese origin, and he replied (R. 82–83):

A. Well, as I recall, this was the case in all six entries, and I am sure in this case, the export documents from the Philippines showed the Philippine consumption entry numbers on the material, that was withdrawn from bond, to be manufactured, and they have the warehouse entries here, and they show the material was actually shipped from Japan to the Philippines and that the merchandise was Japanese merchandise.

The balance of the report deals with the method of arriving at the proper constructed value and the loss of revenue to the Government resulting from the undervaluation and false invoicing. A copy of exhibit B–1 is annexed to the Corcoran report, among other documents, but exhibit B–3 does not appear to be among them.

The record shows that at the time in question Mrs. Marion F. Baker was the district director of customs at Savannah. Apparently, Mrs. Baker, upon receipt of the Corcoran report, communicated by letter with the regional commissioner of customs at Miami in April 1966, concerning the matter. The regional commissioner wrote to Mrs. Baker under date of April 26, 1966, as follows (exhibit A) :

Dear Mrs. Baker:

This is in response to your letter of April 11, 1966, regarding penalties against Sweet Briar, Inc., Greenwood, South Carolina, for false invoicing and undervaluation.

We believe that the attorney for the importer is entitled to know exactly what accusations are being levied against his client. This may be done by exhibiting a representative entry to Mr. Rode. Savannah entry A188 dated August 3, 1964, would be an excellent example in that it shows that the merchandise is undervalued (embroidery charges are not included) and that the entry showed a false country of origin in order to obtain preferential rates.

In order to recover the actual loss of revenue, it is suggested that the liquidated entries covered by this case be reliquidated as soon as possible (Sec. 521 T.A.) using the constructed values shown in the Savannah CAC's report of February 14, 1966, file S–8–423.

Sincerely yours,

/s/ James H. Stover

JAMES H. STOVER,
*Regional Commissioner.*

At the trial Eugene H. Cobb, import specialist at Savannah, testified that the subject entries were originally liquidated "as entered" either by him or under his supervision at the entered values which became the appraised values, and at the entered rates of duty which were the Philippine preferential rates. The "reliquidations" in question were performed by the witness Cobb. As to his authority for reliquidating the subject entries Mr. Cobb testified on direct examination by Government counsel as follows (R. 33) :

Q. Did there come a time in early 1966, Mr. Cobb, when you received instructions from any of your superiors to reliquidate the entries which you have just identified?—A. Yes, sir.

Q. Approximately, when did that occur?—A. Well, we received the authority from the Regional Commissioner of Customs, I believe, on April 24, 1966, which was passed down to me from the District Director through her Assistant in charge of classification and value, which was Mr. William F. Murray, and I proceeded with the reliquidation of the entries.

The witness identified exhibit A as being "the authority from my superiors to reliquidate under Section 521 of the Tariff Act." And he testified that he was in possession of copies of exhibits A and B when he reliquidated the subject entries.

The district director, Marion F. Baker, was not called as a witness in the case.

Section 1521 reads:

> If the collector finds probable cause to believe there is fraud in the case he may reliquidate an entry within two years (exclusive of the time during which protest is pending) after the date of liquidation or last reliquidation.

The language of this statute contemplates a "finding" on the part of the district director (who succeeded to the powers of the collector) that probable cause exists to believe there is fraud in the case as a prerequisite to a reliquidation of an entry under the statute. See section 173.6, Customs Regulations. Where a statute requires a finding to be made by an official before an action can be authorized, the finding is the *sine qua non* to the taking of the action. *Power Comm'n* v. *Pipeline Co.*, 315 U.S. 575, 583 (1942). In the instant case there is no evidence that the district director, Marion F. Baker, ever made such a "finding" following her receipt of exhibit A. And there is no evidence of record as to the district director's state of mind following her receipt of exhibits B and B-1. Although defendant's counsel has argued extensively both at the trial and in his brief in support of the admissibility of evidence on the question of probable cause, he did so on behalf of Mr. Cobb,[4] the liquidating officer, whose function in these premises was ministerial. Consequently, Mr. Cobb's state of mind relative to culpability on the matters the subject of investigation is irrelevant. Additionally, assuming the district director's authority to make a "finding" is delegable by her or her assistant district director there is no evidence of a delegation by her, and there is no evidence before the court of any letter of transmittal or conversation the witness Cobb may have had with William F. Murray, assistant district director, who is said to have handed exhibit A to the witness and who was in charge of entry liquidation.

The court cannot assume that a "finding" under section 1521 had been made by the district director in this case. On the basis of evidence disclosed in the customs agents' reports we think a belief of fraud

---

[4] Direct examination of witness Cobb (R. 38):

BY MR. HARRIS: (Cont'g)

Q. Mr. Cobb, do you have any personal knowledge as to the truth or lack of truth of the assertions in Defendant's Exhibit A for Identification that the embroidery charges were not included in the original appraised values of the merchandise in the various entries about which you have testified, or that the country of origin of the merchandise was falsely stated? Do you have any personal knowledge?—A. None, other than what was presented to me on the attachment of the agent's report. I had to rely entirely on that.

would have been premature. Insofar as the embroidery charges are concerned, the Spanos report shows that embroidery charges were actually paid by the plaintiff; and the customs agent himself characterized their omission from the invoices as having been a "slip up." Thus, while the customs agent's report might be adequate to support a technical charge of undervaluation *per se*, it could hardly be sufficient to support the more serious charge of fraud.

As for the country of origin charge, the reports show that Kalaw Clothes Factory was the depository of synthetic fabric material originating from both Japan and the United States at or about the same time [from Japan by virtue of the formal contract identified as "Exhibit B" in the Spanos report and erroneously characterized in the Corcoran report as necessarily giving rise to the Sweet Briar importations]. Hence, it is not in the least surprising that Kalaw should have been the recipient of fabric material from time to time originating in Japan, and this, while it was doing business with the plaintiff, as is reflected in the Philippine warehouse and consumption entries set forth in entry A1272 and transmitted to this country via exhibit B-3.

The only evidence which purports to connect these Philippine entries with the fabric material covered in entry A1272 is the presence of the "listing" heretofore mentioned in some 20 withdrawals bearing Philippine entry numbers that is attached to the reverse side of the Philippine export inspection certificate filed at the time of exportation of the merchandise covered by United States entry A1272. Apparently, this "listing" was taken at face value by the customs agents as linking the Philippine import and export entries.

But upon examination of this document the court finds that two things militate against the making of any such judgment concerning it on face value as was apparently made by the customs agents involved. One is that the withdrawal listing on one side of the document does not have the remotest connection with anything contained in the inspection certificate on the other side of the same document. The photocopy of the certificate of identification describes the merchandise exported from the Philippines to the United States as 624 dozen dresses on its face, and a photocopy of a document stapled to the back of the certificate shows various entries into the Philippines of a variety of merchandise which is not shown to be in any way connected with the 624 dozen dresses described on the face of the certificate. And the other thing is that the inspection certificate covers products whose spun rayon linen material content amounts to 8,852.29 yards according to the invoice in entry A1272, whereas the withdrawal of spun rayon linen as shown in the "listing" amounts only to 630 yards. Thus, here too, there is no real evidence to justify a belief of fraud.

The court does not at this juncture desire to be understood as substituting its own judgment in the matter for that of the district director.

But it has not been shown to the court that the district director ever made the "finding" of probable cause to believe that there was fraud as is contemplated under section 1521, nor does the record here establish that there was reason to believe there was fraud.

The court agrees with plaintiff when it states, "there is no showing that the District Director took any action or made any decision at all." (Plaintiff's main brief, p. 10.) Consequently, the court finds, as aptly observed by plaintiff, that "defendant's case is missing a major link in its chain of evidence." (Plaintiff's reply brief, p. 4.)

It follows from the foregoing that the reliquidations herein are illegal and void, and must, therefore, be set aside for the reasons stated.

Judgment will be entered herein accordingly.

(C.D. 4559)

C. J. TOWER & SONS OF BUFFALO, INC., a/c METCO, INC.
*v.* UNITED STATES

Court No. 70/30847

(Decided September 26, 1974)

*Serko & Sklaroff* (*Murray Sklaroff* of counsel) for the plaintiff.
*Carla A. Hills,* Assistant Attorney General (*Frederick L. Ikenson* and *Wesley K. Caine,* trial attorneys), for the defendant.

RICHARDSON, Judge: The merchandise in this case, described on the invoice as "Composite PDR 82NI/AL18", was exported from Can-